United States District Court
Southern District of Texas

**ENTERED**

February 22, 2016

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MATTHEW DEWAN, Individually and §
on Behalf of All Others           §
Similarly Situated,               §
                                  §
            Plaintiff,            §
                                  §
VS.                               §    CIVIL ACTION H-15-1746
                                  §
M-I, L.L.C. d/b/a M-I SWACO,      §
                                  §
            Defendant.            §

<u>**OPINION AND ORDER**</u>

Pending before the Court in the above referenced putative

collective action,[1] seeking to recover unpaid overtime wages under

---

[1] Section 216(b) of the FLSA allows a suit to be filed by an
employee against his employer for unpaid minimum wages or unpaid
overtime compensation, either individually or as a collective
action on behalf of himself and "other employees similarly
situated":

> An action . . . may be maintained against any employer .
> . . by any one or more employees for and in behalf of
> himself or themselves and other employees similarly
> situated.  No employee shall be a party to any such
> action unless he gives his consent in writing to become
> such a party and such consent is filed in the court in
> which such action is brought.

Putative class members must "opt-in," i.e., affirmatively
notify the court of their intention to become parties to the
collective action by written consent.  29 U.S.C. § 216(b); *Mooney
v. Aramco Servs. Co.*, 54 F.3d 1207, 1212 (5th Cir.1995), *overruled
on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 91-
92 (2003).  While the FLSA allows an employee to bring a claim on
behalf of similarly situated employees, those other employees do
not become plaintiffs in the suit unless and until they consent in
writing. § 216(b).
       Typically such putative collective class actions proceed in
two stages.  See *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 381-82
(D.N.J. 1987)(describing two-step procedure (conditional

the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201-219, are (1) Defendant M-I, L.L.C. d/b/a M-I Swaco's ("M-I's") motion for summary judgment (instrument #31) on the grounds that Dewan and Casey do not qualify as exempt employees under the administrative, outside sales, and/or combination exemptions from the FLSA overtime provision and (2) Plaintiff Matthew Dewan ("Dewan") and Opt-in Plaintiff William J. Casey's motion for partial judgment on the pleadings as to M-I's affirmative defenses relating to exemptions and good faith under the FLSA (#48).

Dewan's Original Complaint (#1 at p.7, ¶ 34) defines the FLSA class as follows:

---

certification and notice stage followed by possible decertification stage in putative FLSA cases), followed by most district courts in the Fifth Circuit).   Before notice may issue to potential class members, the court must conditionally certify the class as a collective action.   Conditional certification "is not tantamount to class certification under Rule 23." *Genesis Healthcare Corp. v. Symcyk*, 133 S. Ct. 1523, 1532 (2013).   The only effect of a conditional certification is that a court-approved written notice may then be sent to similarly situated putative class members, who then may choose to become parties to a collective action by filing a written consent with the court. *Id.* at 1530, *citing* 29 U.S.C. § 216(b).   Courts have discretion in determining whether to certify a collective action under the FLSA and to authorize notice to similarly situated employees advising them of their right to join such a collective action. *Mooney*, 54 F.3d at 1213.

Rules for a FLSA collective action are fundamentally different from those for a Rule 23 class action. *LaChapelle v. Owens-Illinois, Inc.*, 513 F.2d 286, 288-89 (5th Cir. 1975).   To join a FLSA collective action, one affirmatively opts-in by filing a written consent in the case to become a party plaintiff, while Rule 23(c) a class is described by the plaintiff and if it can be maintained as a class action, each person who is covered by the description is automatically considered to be a class member, bound by any judgment in the case, unless he has "opted-out" of the suit. *Id.*

All current and former drilling fluid specialists or any other employee who: (1) worked at any business located in the United States that was owned, operated, and/or acquired by Defendant during the class period; (2) claim they were misclassified as exempt from overtime compensation or was [*sic*] an hourly employee and now seek payment for overtime hours worked; and/or (3) were compensated on any basis where they were not properly paid at a rate of time and a half for hours worked in excess of forty (40).

The two motions deal with overlapping issues: (1) Whether M-I has adequately pleaded its affirmative defenses and whether Dewan and Casey qualify for the administrative, outside sales, and/or combination exemptions from the FLSA overtime provisions; (2) whether M-I has adequately pleaded an affirmative good faith defense for itself; and (3) whether Casey is properly a Plaintiff in this lawsuit.

## Standards of Review

### *Summary Judgment under Fed. R. Civ. P. 56*

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when, viewing the evidence in the light most favorable to the nonmovant, the court determines that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).

Where the nonmovant bears the burden of proof at trial, the movant must offer evidence that undermines the nonmovant's claim or point out the absence of evidence supporting essential elements of the nonmovant's claim; the movant may, but does not have to, negate the elements of the nonmovant's case to prevail on summary judgment." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990); *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998). "A complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

If the movant meets its burden and points out an absence of evidence to prove an essential element of the nonmovant's case on which the nonmovant bears the burden of proof at trial, the nonmovant must then present competent summary judgment evidence to support the essential elements of its claim and to demonstrate that there is a genuine issue of material fact for trial. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d 698, 712 (5th Cir. 1994). "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." *Celotex*, 477 U.S. at 323. The nonmovant may not rely merely on allegations, denials in a pleading or unsubstantiated assertions that a fact issue exists, but must set

forth specific facts showing the existence of a genuine issue of material fact concerning every element of its cause(s) of action. *Morris v. Covan World Wide Moving, Inc,*, 144 F.3d 377, 380 (5th Cir. 1998).

Conclusory allegations unsupported by evidence will not preclude summary judgment. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 713; *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). "'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . .'" *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990), *quoting Anderson v. Liberty Lobby, Inc.*. 477 U.S. 242, 247-48 (1986). "Nor is the 'mere scintilla of evidence' sufficient; 'there must be evidence on which the jury could reasonably find for the plaintiff.'" *Id., quoting Liberty Lobby*, 477 U.S. at 252. The Fifth Circuit requires the nonmovant to submit "'significant probative evidence.'" *Id., quoting In re Municipal Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1978), and *citing Fischbach & Moore, Inc. v. Cajun Electric Power Co-Op.*, 799 F.2d 194, 197 (5th Cir. 1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 644 (5th Cir. 1999), *citing Celotex*, 477 U.S. at 322, and *Liberty Lobby*, 477 U.S. at 249-50.

-5-

Allegations in a plaintiff's complaint are not evidence. *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996)("[P]leadings are not summary judgment evidence."); *Johnston v. City of Houston, Tex.,* 14 F.3d 1056, 1060 (5th Cir. 1995)(for the party opposing the motion for summary judgment, "only evidence--not argument, not facts in the complaint--will satisfy' the burden."), *citing Solo Serve Corp. v. Westown Assoc.*, 929 F.2d 160, 164 (5th Cir. 1991). The nonmovant must "go beyond the pleadings and by [his] own affidavits, or by depositions, answers to interrogatories and admissions on file, designate specific facts showing that there is a genuine issue of material fact for trial." *Giles v. General Elec. Co.*, 245 F.3d 474, 493 (5th Cir. 2001), *citing Celotex*, 477 U.S. at 324.

The court must consider all evidence and draw all inferences from the factual record in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 712-13. The Court may not make credibility determinations. *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009), *citing Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 343 (5th Cir. 2007).

### *Rule 12(c) Judgment on the Pleadings*

Rule 12(c) provides, "After the pleadings are closed--but early enough not to delay trial--a party may move for judgment on

the pleadings." A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is "designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Herbert Abstract Co. v. Touchstone Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990), *citing* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1367, at 509-10 (1990)("The federal courts have followed a fairly restrictive standard in ruling on motions for judgment on the pleadings. . . . The importance of the policy [in favor of ensuring to each litigant a full and fair hearing on the merits of his or her claim or defense] has made federal judges unwilling to grant a motion under Rule 12(c) unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law."). *See also Great Plaints Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002)("Pleadings should be construed liberally, and judgment on the pleadings is appropriate only if there are no disputed issues of fact and only questions of law remain."). The same standard used to review motions under Rule 12(b)(6) applies to motions under Rule 12(c). *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008). The issue is whether the plaintiff is entitled to offer evidence to support his claim, not whether he will ultimately prevail on the merits. *Doe v. Hillsboro*

*I.S.D.*, 81 F.3d 1395, 1401 (5th Cir. 1996).  The same standard of review also applies to affirmative defenses.  *Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999).

If matters beyond the pleadings are introduced, the Rule 12(c) motion becomes one for summary judgment under Rule 56.  "Hasty or imprudent use of this summary judgment procedure by the courts violates the policy in favor of ensuring to each litigant a full and fair hearing on the merits of his or her claim or defense.  5C Charles Alan Wright *et al*, *Federal Practice & Procedure* § 1368 (3d ed. data base updated Apr. 2015).

### Rule 12(b)(6)

When a district court reviews a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), it must construe the complaint in favor of the plaintiff and take all well-pleaded facts as true. *Randall D. Wolcott, MD, PA v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011), *citing Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009).  The plaintiff's legal conclusions are not entitled to the same assumption. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."), *citing Bell Atlantic Corp. v. Twombly*, 556 U.S. 662, 678 (2007); *Hinojosa v. U.S. Bureau of Prisons*, 506 Fed. Appx. 280, 283 (5th Cir. Jan. 7, 2012).

"While a complaint attacked by a Rule 12(b)(6) motion to

dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007)(citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965, *citing* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1216, pp. 235-236 (3d ed. 2004)("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"). "*Twombly* jettisoned the minimum notice pleading requirement of *Conley v. Gibson*, 355 U.S. 41 . . . (1957)["a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"], and instead required that a complaint allege enough facts to state a claim that is plausible on its face." *St. Germain v. Howard*,556 F.3d 261, 263 n.2 (5th Cir. 2009), *citing In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)("To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"), *citing Twombly*, 127 S. Ct. at 1974). "'A claim has facial plausibility when the pleaded factual content allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Montoya v. FedEx Ground Package System, Inc.*, 614 F.3d 145, 148 (5th Cir. 2010), *quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The plausibility standard is not akin to a "probability requirement," but asks for more than a "possibility that a defendant has acted unlawfully." *Twombly*, 550 U.S. at 556.  Dismissal is appropriate when the plaintiff fails to allege "'enough facts to state a claim to relief that is plausible on its face'" and therefore fails to "'raise a right to relief above the speculative level.'" *Montoya*, 614 F.3d at 148, *quoting Twombly*, 550 U.S. at 555, 570.

In *Ashcroft v. Iqbal*, 556 U.S. at 679, the Supreme Court stated that "only a complaint that states a plausible claim for relief survives a motion to dismiss," a determination involving "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" under Rule 12(b).  *Iqbal*, 129 S. Ct. at 1949.  The plaintiff must plead specific facts, not merely conclusory allegations, to avoid dismissal.  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). "Dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief . . . ." *Rios v. City of Del Rio, Texas*, 444 F.3d 417, 421 (5th Cir. 2006), *cert. denied*, 549

U.S. 825 (2006).

"Rule 12(b) is not a procedure for resolving contests about the facts or the merits of a case." *Gallentine v. Housing Authority of City of Port Arthur, Tex.*, ___ F. Supp. 2d ___, Civ. A. No. 1:12-CV-417, 2013 WL 244651, *3 (E.D. Tex. Jan. 22, 2012), *citing* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil 2d* § 1356, at 294 (1990).

As noted, on a Rule 12(b)(6) review, although generally the court may not look beyond the pleadings, the Court may examine the complaint, documents attached to the complaint, and documents attached to the motion to dismiss to which the complaint refers and which are central to the plaintiff's claim(s), as well as matters of public record. *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC,* 594 F.3d 383, 387 (5th Cir. 2010), *citing Collins*, 224 F.3d at 498-99; *Cinel v. Connick*, 15 F.3d 1338, 1341, 1343 n.6 (5th Cir. 1994). *See also United States ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 379 (5th Cir. 2003)("the court may consider . . . matters of which judicial notice may be taken"). Taking judicial notice of public records directly relevant to the issue in dispute is proper on a Rule 12(b)(6) review and does not transform the motion into one for summary judgment. *Funk v. Stryker Corp.*, 631 F.3d 777, 780 (5th Cir. 2011). "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial

jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).

### Federal Rule of Civil Procedure 12(f)

In relevant part Rule 12(f) states, "The court may strike from a pleading an insufficient defense . . ." on its own motion or "on a motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading."  The Fifth Circuit, pre-*Twombly* and *Iqbal*, opined about pleading affirmative defenses,

> The Federal Rules require an affirmative defense to be pleaded; failure to plead such a defense constitutes waiver.  An affirmative defense is subject to the same pleading requirements as is the complaint.  Even though the aim of the relaxed notice pleading standards of Federal Rule of Civil Procedure 8 is to prevent parties from being defaulted for committing technical errors, a defendant nevertheless must plead an affirmative defense with enough specificity or factual particularity to give the plaintiff 'fair notice' of the defense that is being advanced.  We acknowledge that in some cases merely pleading the name of the affirmative defense . . . may be sufficient.

*Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999)(footnotes omitted).

While no Circuit Court of Appeals has decided whether the heightened, plausibility pleading standard of *Twombly* and *Iqbal* or the relaxed, "fair notice" requirement of Rule 8(a)[2] applies to the

---

[2] *I.e.*, "the defense is "sufficiently articulated so that the plaintiff was not a victim of unfair surprise."

pleading of an affirmative defense, district courts in the Fifth Circuit are divided on the issue. *See U.S. ex rel. Parikh v. Citizens Medical Center*, 302 F.R.D. 416, 418 (S.D. Tex. 2014)(listing cases on both sides). In *Parikh*, the Honorable Gregg Costa decided to apply the fair notice standard. *Id.* at 419. He first noted the Honorable Keith P. Ellison's "three compelling reasons" in *Florida v. DLT 3 Girls, Inc.*, Civ. A. No. 4:11-cv-3624, 2012 WL 1565533, *2 (S.D. Tex. May 2, 2012), for the applying the fair notice standard even though Judge Ellison noted that the majority of district courts have applied the *Twombly* and *Iqbal* standard to pleading affirmative defenses. Judge Ellison persuasively reasoned,

> First, a different standard for plaintiffs and defendants is sensible, given that defendants have only 21 days within which to serve an answer. Second, *Twombly* and *Iqbal* address Rule 8(a)(2), the language of which differs in important respects from Rule 8(c)[1],[3] the provision concerning affirmative defenses. Third, while a motion to dismiss can resolve a case, thereby avoiding discovery

---

[3] Regarding "General Rules of Pleading," Rule 8(a)(2) provides, "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Specifically addressing "Affirmative Defenses" instead, Rule 8(c)(1) requires, "In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense." *See Aros v. United Rentals, Inc.*, Civ. A. No. 3:10-CV-73(JCH), 2011 WL 5238829, at *3 (D. Conn. Oct. 31, 2011)(*Twombly* and *Iqbal* do not apply to affirmative defenses; the Supreme Court's underlying concern in *Twombly* and *Iqbal* is dismissing unfounded cases before they proceed to costly discovery, while an affirmative defense at most affects the scope of discovery; raising the standard for pleading affirmative defenses would encourage motions to strike, which are disfavored and which only prolong pre-discovery motion practice).

> entirely, motions to strike only prolong pre-discovery
> motion practice; as such, raising the standard for
> pleading affirmative defenses would only encourage
> motions to strike. [citations omitted]

Judge Costa found an additional reason in the facial texts of Rule 12(f), permitting courts to strike an "insufficient defense," and of Rule 12(b)(6), which addresses "failure to state a claim." *Parikh*, 302 F.R.D. at 419, *citing* 5C Wright & Miller, *Federal Practice & Proc. Civ.* § 1381 (3d ed.)("explaining that Rule 12(f) motions 'are a useful and appropriate tool when the parties disagree only on the legal implications to be drawn from uncontroverted facts'; . . . "in sum a motion to strike will not be granted if the insufficiency of the defense is not clearly apparent, or if it raises factual issues that should be determined on a hearing on the merits"), as opposed to *Iqbal*'s focus on whether the defense "contain[s] sufficient factual matter."). *In accord*, *Republic Title of Texas, Inc. v. First Republic Title, LLC*, 2015 WL 1914635, at *1 and n.3 (N.D. Tex. Apr. 27, 2015)(Boyle, J.)(citing cases applying fair notice pleading standard to affirmative defenses); *Dyson v. Stuart Petroleum Testers, Inc.*, No. 1-15-CV-282 RP, 2015 WL 4935527, at *2-3 (W.D. Tex. Aug. 18. 2015); *Rodriguez v. Physician Lab. Serv. LLC*, No. 13-CV-622, 2014 WL 847126, at *1-2 (S.D. Tex. Mar. 4, 2014).[4]  This Court finds the

---

[4] In its response (#51 at pp. 13-14), M-I notes that in a recent opinion, *Garrison Realty, LP v. Fouse Architecture & Interiors, PC*, 546 Fed. Appx. 458, 465 (5th Cir. Oct. 21, 2013), in concluding that an affirmative defense of offset from a settlement

reasoning of these cases, applying the fair notice standard as opined by the Fifth Circuit in *Woodfield*, 193 F.3d at 362, to be persuasive.

*Federal Rule of Civil Procedure 16(b)(4)*

After the court has entered a scheduling order and after the deadline for amending pleadings has passed, Federal Rule of Civil Procedure 16(b)(4) governs:  "A schedule may be modified only for good cause and with the judge's consent." *Southwestern Bell Tel. Co. v. City of El Paso*, 346 F.3d 54, 546 (5th Cir. 2003); *S&W Enterprises, LLC v. SouthTrust Bank of Alabama, NA*, 315 F.3d 533, 536 (5th Cir. 2002).  To determine whether good cause for modification exists, the Court must weigh four factors:  the party's explanation for its failure to timely move for leave to amend; the importance of the amendment; potential prejudice if amendment is permitted; and the availability of a continuance to cure such prejudice.  *S&W Enterprises*, 315 F.3d 536.  The party seeking the modification must satisfy the good cause standard by demonstrating that the deadlines could not "'reasonably be met

---

credit in a prior suit, unpleaded and therefore waived in the later suit, could be untimely raised in the later suit, the Fifth Circuit continued to use the *Woodfield* fair notice standard.  Noting that "[a] court may excuse the failure to plead an affirmative defense . . . if the opposing party is not prejudiced," and "employ[ing] a fact-specific analysis" to decide "whether the plaintiff was unfairly surprised" under *Woodfield*, the Fifth Circuit nevertheless found that "Fouse's pleading was insufficient to indicate that it was asserting a defense of offset or settlement credit" that "should partially reduce any judgment." *Id.* at 465.

despite the diligence of the party needing the extension." *S&W Enterprises*, 315 F.3d 535, *citing 6A Charles Alan Wright,* et al., *Federal Practice and Procedure* § 1522.1 (2d ed. 1990).   To determine whether good cause for modification exists, the Court must weigh four factors: the party's explanation for the failure to timely move for leave to amend; the importance of the amendment; potential prejudice if amendment is permitted; and the availability of a continuance to cure such prejudice. *S&W Enterprises*, 315 F.3d 536, *citing Reliance Ins. Co. v. La. Land & Exploration Co.*, 110 F.3d 253, 257 (5th Cir. 1997).   Despite the four-factor test, a court sill has "inherent power to control its own docket to ensure that cases proceed before it in a timely and orderly fashion." *U.S. v. Waldman*, 579 F.2d 649, 652 (1st Cir. 1978)

> A trial court may modify or amend a scheduling order only when "good cause" is shown and the court grants leave to modify.   Unless a court permits modification, motions filed after the motion deadline are untimely and may be denied solely on that basis.

3 *Moore's Federal Practice* § 16.14[1][a] (Matthew Bender 3d ed. 2006).

### Allegations of the Original Complaint (#1)

The Complaint, brought by Matthew Dewan ("Dewan"), individually and on behalf of all others similarly situated, alleges that from approximately September 2010 through November 2012, Dewan worked as a nonexempt drilling fluid specialist (also known as a "mud man" or a "mud engineer") for M-I, which claims to

be "the [oil industry's] leading supplier of drilling fluid systems engineered to improve drilling performance by anticipating fluids-related problems, fluid systems and specialty tools designed to optimize wellbore productivity, production technology solutions to maximize production rates, and environmental solutions that safely manage waste volumes generated in both drilling and production operations." #1 at ¶ 9 and 10. A drilling fluid specialist's job is to ensure the properties of the drilling fluid (a/k/a drilling mud) are within designed specifications.

Dewan asserts that in willful violation of the FLSA, instead of paying drilling fluid specialists time and a half for all hours worked beyond 40 per week, M-I pays them a fixed sum that does not take into consideration the number of hours per week that they have worked. Dewan also argues that if M-I has classified him as exempt from FLSA's overtime compensation, M-I has misclassified him. He further charges that M-I failed to keep accurate records of its employees' time worked.[5]

---

[5] Title 29 U.S.C. § 211(c) requires that the employer "make, keep and preserve such records of the persons employed by him and of the wages, hours, and other conditions of employment maintained by him." As summarized in *Lynch v. Jet Center of Dallas, LLC*, Civ. A. No. 3:05-CV-2229-L, 2007 WL 211101, *5 (N.D. Tex. Jan. 26, 2007),

> Under the FLSA, "an employee who brings suit for unpaid overtime compensation bears the burden of proving, with definite and certain evidence, that he performed work for which he was not properly compensated." *Reeves v. International Telephone & Telegraph Co.*, 616 F.2d 1342, 1351 (5th Cir. 1980), *cert. denied*, 449 U.S. 1077 . . . (1981), *implicit overruling on other grounds recognized*

**Relevant Law:  The FLSA**

The FLSA mandates that employers pay overtime compensation for nonexempt employees.[6]  *Rainey v. McWane, Inc.*, 314 Fed. Appx. 693, 694 (5th Cir. Mar. 12, 2009), citing 29 U.S.C. § 207(a).   The FLSA, 29 U.S.C. § 207(a)(1), generally requires an employer to pay employees who work more than forty hours per seven-day work week at a rate not less than one and one-half times the employee's regular

---

> *in Heidtman v. County of El Paso*, 171 F.3d 1038, 1042 n.4 (5th Cir. 1999).  Where an employer keeps incomplete or [in]accurate records, however, "an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."  *In re Williams*, 298 F.3d 458, 465 (5th Cir. 2002)(*citing Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 . . . (1946) [superseded in part by statute on other grounds by The Portal-to-Portal Act, amending FLSA in 1947, 29 U.S.C. § 251, *et seq.*].  The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from the employee's evidence.  *Anderson*, 328 U.S. at 687-88.  "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate."  *Id.* at 688.

As stated by the Supreme Court, "The remedial nature of this statute and the great public policy which it embodies . . . militate against making [the plaintiff's burden] an impossible hurdle for the employee."  *Anderson*, 328 U.S. at 687.
       The issue of records only becomes relevant if M-I fails to prove that Dewan and possibly Casey are not exempt from the FSLA's overtime provision.

       [6] Section 207(a)(1) does not apply to those "employed in bona fide executive, administrative, or professional capacity."  *Rainey*, 314 Fed. Appx. at 694-5, citing 29 U.S.C. § 213(a)(1).

hourly rate. *Allen v. Coil Tubing Servs., LLC*, Civ. A. No. H-08-3370, 2011 WL 4916003, *5 (S.D. Tex. Oct. 17, 2011); *Vela v. City of Houston*, 276 F.3d 659, 666 (5th Cir. 2001); *Thibodeaux v. Executive Jet Intern., Inc.*, 328 F.3d 742, 749 (5th Cir. 2003). Under 29 U.S.C. § 216(b), an employer who violates the FLSA shall be liable for "unpaid overtime compensation . . . and in an additional equal amount as liquidated damages." Moreover any person who repeatedly or willfully violates Section 206 or 207, relating to wages, shall be subject to a civil penalty not to exceed $1,100 for each such violation." 29 U.S.C. § 216(e)(2).[7]

Thus an employer who violates the FLSA is liable for liquidated damages equal to the unpaid overtime unless the court finds that the employer acted in good faith and had reasonable grounds to believe that his actions complied with the statute and therefore declines to award or reduces the amount of the liquidated damages. *Stokes v. BWXT Pantex, LLC*, 424 Fed. Appx. 324, 326 (5th Cir. May 4, 2011), citing 29 U.S.C. § 260. The employer bears the

---

[7] Under the FLSA, a violation is "willful" if the employer "'either knew or showed reckless disregard for . . . whether its conduct was prohibited by the statute.'" *Singer v. City of Waco, Tex.*, 324 F.3d 813, 821 (5th Cir. 2002), *quoting Reich v. Bay, Inc.*, 23 F.3d 110, 117 (5th Cir. 1994), *quoting McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). The plaintiff bears the burden of demonstrating that the FLSA violation was willful. *Id.*

Under 29 U.S.C. § 255(a), a cause of action for unpaid overtime under the statute "shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued."

burden of demonstrating that it acted in good faith to escape mandatory liquidated damages under the statute. *Perez*, 2011 WL 2672431, at *9, *citing Singer v. City of Waco, Tex.*, 324 F.3d 813, 821 (5th Cir. 2003), and *Stokes v. BWXT Pantex, LLC*, 424 Fed. Appx. at 326.

The FLSA identifies several situations in which employers are exempt from the Act's wage and hour requirements. 29 U.S.C. § 213(a)(1)("The provisions of section 206 (except subsection (d) in the case of paragraph (1) of this subsection) and section 207 of this title shall not apply with respect to . . . any employee employed in a bona fide executive, administrative, or professional capacity[8] (including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools), or in the capacity of outside salesman (as such terms are defined and delimited from time to time by regulations of the Secretary [of Labor], subject to the provisions of subchapter II of chapter 5 of Title 5, except that an employee of a retail or service establishment shall not be excluded from the definition of employee employed in a bona fide executive or administrative capacity because of the number of hours in his workweek which he

---

[8] THE FLSA does not further discuss these "white collar" exemptions to its overtime pay provisions, but delegates authority to the Secretary of Labor to promulgate rules to define them. *Big Lots*, 604 F. Supp. 2d at 907. Thus the Court discusses *infra* the Secretary's regulations that are relevant to the exemptions asserted in this action.

devotes to activities not directly or closely related to the performance of executive or administrative activities, if less than 40 per centum of his hours worked in the workweek are devoted to such activities."); *see also* 29 C.F.R. §§ 541.0, *et seq.*

Exemption is narrowly construed against the employer, and the employer bears the burden of demonstrating that an employee is exempt. *Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 402 (5th Cir. 2002), *citing Dalheim v. KDFW-TV*, 918 F.2d 1220, 1224 (5th Cir. 1990); *King v. Stevenson Beer Distributing Co.*, 11 F. Supp. 3d 772, 780 (S.D. Tex. 2014). "Exempt status is limited to those employees "plainly and unmistakably" covered by the "terms and spirit[]" of the exemptions. *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960). Whether an employee is exempt or not exempt under the FLSA is mainly a fact issue determined by his salary and duties and application of the factors in 29 C.F.R. § 541.0 *et seq.*,[9] but the ultimate decision is a question of law. *Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326, 330-31 (5th Cir. 2000); *McKee v. CBF Corp.*, 299 Fed. Appx. 426, 429 (5th Cir. Nov. 17, 2008); *King*, 11 F. Supp. 3d at 780, *citing id.*, *McKee v. CBF Corp.*, 299 Fed. Appx. 426, 429 (5th Cir. 2008), and *Dahlheim*, 918 F.2d at 1226.

M-I argues that Dewan is exempt under the administrative,

---

[9] 29 C.F.R. § 541.2 clearly states, "A job title alone is insufficient to establish the exempt status of an employee. The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part."

outside sales, and combination exemptions, each of which requires
the Court to determine what constitutes Dewan's "primary duty."  29
C.F.R. § 541.700(a)[10] defines an employee's "primary duty" as "the
principal, main, major or most important duty that the employee
performs."   In determining an employee's primary duty the court
considers which aspects of the employee's job are "'of principal
value to the employer,'" not any collateral duties he may also
perform even if those take more than half of the employee's time.
*King*, 11 F. Supp. 3d at 781, *citing Dalheim*, 918 F.2d at 1227.  The
determination "must be based on all the facts in a particular case,
with the major emphasis on the character of the employee's job as
a whole."   *Id.*   Factors to be weighed in this analysis include
"'the relative importance of the exempt duties as compared with
other types of duties; the amount of time spent performing exempt
work; the employee's relative freedom from direct supervision; and
the relationship between the employee's salary and the wages paid

---

[10] Section 541.700(a) states that the term "primary duty" is

the principal, main, major, or most important duty that
the employee performs.   Determination of an employee's
primary duty must be based on all the facts in a
particular case, with the major emphasis on the character
of the employee's job as a whole.   Factors to consider
when determining the primary duty of an employee include,
but are not limited to, the relative importance of the
exempt duties as compared with other types of duties; the
amount of time spent performing exempt work; the
employee's relative freedom from direct supervision; and
the relationship between the employee's salary and the
wages paid to other employees for the kind of nonexempt
work performed by the employee.

to other employees for the kind of nonexempt work performed by the employee.'"  *Id., citing id.* and 29 C.F.R. § 541.700(a)(To qualify for an exemption under the FLSA, the employee's primary duty must be the performance of exempt work).  If an employee is closely supervised and earns little more than nonexempt employees, that employee usually does not meet the primary duty requirement.  29 C.F.R. § 541.700(c).  The amount of time spent on exempt work aids the determination of whether it is the employee's primary duty, but it is not the sole test:  "'Employees who spend less than fifty percent of their time performing exempt work may still meet the primary duty requirement if other factors support such a conclusion.'"  *Id., citing Gellhaus v. Wal-Mart Stores, Inc.*, 769 F. Supp. 2d 1071, 1078 (E.D. Tex. 2011), *citing* 29 C.F.R. § 541.700(b)("The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee.  Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement.  Time alone, however, is not the sole test, and nothing in this section requires that exempt employee spend more than 50 percent of their [*sic*] time performing exempt work.  Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty

requirement if the other factors support such a conclusion.").[11]

To be covered under the administrative exemption, "an employee must perform work directly related to assisting with the running or servicing of the business."  29 C.F.R. § 541.201(a).[12]  To qualify

---

[11] For example, § 541.700(c) elaborates regarding the executive exemption,

> Thus, for example, assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more that 50 percent of the time performing nonexempt work such as running the cash register.  However, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement.

[12] The regulation, 29 C.F.R. § 541.201 ("Directly related to management or general business operations"), provides in total,

> (a) To qualify for the administrative exemption, an employee's primary duty must be the performance of work directly related to the management or general business operations of the employer or the employer's customers. The phrase "directly related to the management or general business operations" refers to the type of work performed by the employee.  To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.

> (b) Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing procurement; advertising; marketing; research; safety and health; personnel management, human resources; employee benefits; labor relations; government relations; computer network; internet and database administration;

for the administrative exemption, FLSA requires the employee to be paid on a salary or fee basis at a rate of not less than $455 per week, have a primary duty of performing office or non-manual work directly related to the management policies or general business operations of the employer or its customers, and whose primary duties include the exercise of discretion and independent judgment with respect to matters of significance."[13]   29 C.F.R. § 541.200(a)(1)-(3); *King*, 11 F. Supp. 3d at 783.  It is the actual day-to-day activities of the employee, not the labels the employee or the employer apply to those duties, that determine whether the employee is exempt under the FLSA.  *Tyler v. Union Co. v. Calif.*, 304 F.3d 379, 404 (5th Cir. 2002); *Kohl v. Woodlands Fire Dep't*, 440 F. Supp. 2d 626, 637 (S.D. Tex. 2006)..

"'Matters of significance'" means "'the level of importance or

---

legal and regulatory compliance; and similar activities. Some of these activities may be performed by employees who also would qualify for another exemption.

(c) An employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations of the employer's customers. Thus, for example, employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt.

[13] "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered.  The term "matter os significance" refers to the level of importance or consequence of the work performed."  29 C.F.R. § 541.202(a).

consequence of the work performed.'" *Id., citing* § 541.202(a). To satisfy this requirement, the worker must, as indicated *supra*, "'perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.'" *Id.* at 784*, citing* § 541.201(a).[14]   29 C.F.R. § 541.201(b) identifies types of work "directly related to management business operations" with a nonexhaustive list of examples. *Id.   See* footnote number 12 of this Opinion and Order, § 541.201(b).

　　"The 'exercise of discretion and independent judgment'

---

[14] In *Verkuilen v. MediaBank, LLC*, 646 F.3d 979, 981 (7th Cir. 2011)(citations omitted), the appellate court offers a rationale for the administrative exemption:

> Yet one sees what the regulation is getting at:  a legal requirement to pay a worker a fixed percentage increase in his hourly wage if he works more than 40 hours a week doesn't fit a worker who spends much of his work time off the employer's premises, where he can't be supervised and so if entitled to overtime would be tempted to inflate his hours.  The danger is acute if, as the regulation also requires, the work involves the exercise of independent judgment relating to management or general business operations, especially the business operations of a customer.  An employer will be hard pressed to determine how many hours an employee should need to complete a particular job much of which is performed on the premises of a different company and involves the application of independent judgment to that company's operations.  Employees tasked with jobs requiring the exercise of independent judgment usually are expected to work with a minimum of supervision even when they are working in their office rather than on a customer's premises.

generally involves the 'comparison and evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered.'" *King*, 11 F. Supp. 3d at 784, *citing* § 541.202(a).  In addition § 541.202(b) provides,

> "Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to:  whether the employee has the authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have a significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances."

*Id*. at 784, *quoting* § 541.202(b).  Although a case-by-case analysis must be performed, generally federal courts have found that employees who satisfy at least two of the factors in § 541.202(b) are exercising discretion and independent judgment.  *Villegas v. Dependable Construction Services, Inc.*, Civ. No. 4:07-cv-2165, 2008 WL 5137321, at *10 (S.D. Tex. Dec. 8, 2008).  Moreover, § 541.202(c) states,

    The exercise of discretion and independent judgment

-27-

> implies that the employee has authority to make an
> independent choice, free from immediate direction or
> supervision. However, employees can exercise discretion
> and independent judgment even if their decisions or
> recommendations are reviewed at a higher level. Thus,
> the term "discretion and independent judgment" does not
> require that the decisions made by an employee have a
> finality that goes with unlimited authority and complete
> absence of review. The decisions made as a result of the
> exercise of discretion and independent judgment may
> consist of recommendations for action rather than the
> actual taking of action. The fact that an employee's
> decision may be subject to review and that upon occasion
> the decision are revised or reversed does not mean that
> the employee is not exercising discretion and independent
> judgment.

*See also Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 403 (5th Cir. 2002)("Final decision making authority over matters of consequence is unnecessary."). Consulting manuals or guidelines for help does not preclude the employee's exercise of discretion and independent judgment. *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 585 (5th Cir. 2006), *citing McAllister v. Transamerica Occidental Life Ins. Co.*, 325 F.3d 997, 1001 (8th Cir. 2003).

What is known as the "production v. administrative dichotomy," or "work related to the goods and services which constitute the business' marketplace offerings and work which contributes to 'running the business itself,'" is a helpful tool to decide who should and who should not fall under the administrative exemption. *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1127 (9th Cir. 2002). *See also, e.g., Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529. 535 (2d Cir. 2009)("[W]e have drawn an important distinction between employees directly producing the good or service that is the

-28-

primary output of a business and employees performing general administrative work applicable to the running of any business."; *Dalheim*, 918 F.2d at 1230 (dichotomy distinguishes between "those employees directly producing the good or service that is the primary output of a business and employees performing general administrative work applicable to the running of any business."). Work which does not fall squarely on the production side of the dichotomy, such as the work of janitors, security guards, cooks in a cafeteria, or ordinary selling, does not automatically qualify as administrative work. *Martin v. Indiana Michigan Power Co.*, 381 F.3d 574, 582-83, 904-05 (6th Cir. 2004)(holding that an IT support specialist whose primary duties were troubleshooting and solving computer problems did not fall under the administrative exemption in part because the specialist's work was not "of substantial importance to the management or operation of the business of his employer" and because he did not design or develop his employer's computer network or determine how to configure the software available on that network)("The regulations do not set up an absolute dichotomy under which all work must either be classified as production or administrative. Rather the regulations distinguish production work for the administrative operations of the business as 29 C.F.R. § 541.204(a)--thus production work cannot be administrative--and then go on to define the administrative operations of the business as 29 C.F.R. 205(b)."), *citing Schaefer*

*v. Indiana Michigan Power Co.*, 358 F.3d 392, 402-03 (6th Cir. 2004). *In accord, Graves v. Chubb & Son, Inc.*, Civ. A, Vo. 3:12-CV-568 (JCH), 2014 WL 1289464, at *5 (D. Conn. Mar. 31, 2014)("Production work is never administrative, but work is not necessarily administrative simply because it does not clearly qualify as production."); *Calderon v. GEICO Gen. Ins. Co.*, 917 F. Supp.2d 428, 437 (D. Md. Nov. 29, 2012)("Work is not classified as administrative simply because it does not fit completely within the definition of production.").

M-I also claims that Dewan qualifies for the outside salesman exemption. Not only does a salesman largely work alone with no restrictions on the time, but he chooses when to work and he can earn "within the range of his ability, as his ambition dictates," and furthermore "'an outside salesman's extra compensation comes in the form of commissions, not overtime, and because most of the salesman's work is performed away from the employer's place of business, the employer often has no way of knowing how many hours an outside salesman works.'" *Id.* at 785, *quoting Meza v. Intelligent Mexican Marketing*, *Inc.*, 720 F.3d 577, 581 (5th Cir. 2013), *quoting Jewel Tea Co. v. Williams*, 118 F.2d 202, 207-08 (10th Cir. 1941). The FLSA does not define what an employee employed as an "outside salesman" is, but 29 U.S.C. § 541.500(a)(1)-(2) states that the term refers to any employee

"(1) Whose primary duty is (i) making sales within the

> meaning of section [203(k) of the FLSA][15] or (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and
>
> (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty."

*Id., citing Meza*, 720 F.3d at 581, *quoting* 29 U.S.C. § 213(a)(1)(identifying exemptions).  *See also* 29 C.F.R. § 541.501.

When an employee both delivers and sells products, 29 C.F.R. § 541.054 applies.  *See, e.g., Meza*, 720 F.3d at 581-82.  Section 541.504 provides in relevant part,

> (a) Drivers who deliver products and also sell such products may qualify as exempt outside sales employees only if the employee has a primary duty of making sales. In determining the primary duty of drivers who sell, work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including loading, driving or delivering products, shall be regarded as exempt outside sales work.
>
> (b) Several factors should be considered in determining if a driver has a primary duty of making sales, including, but not limited to:  a comparison of the driver's duties with those of other employees engaged as truck drivers and as salespersons; possession of a selling or solicitor's license when such license is required by law or ordinances; presence or absence of customary or contractual arrangements concerning amounts of products to be delivered; description of the employee's occupation in collective bargaining agreements; the employer's specifications as to qualifications for hiring; sales training; attendance at sales conferences; method of payment; and proportion of earnings directly attributable to sales.

---

[15] Section 203k of the FLSA defines "sale" or "sell" as "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition."  29 U.S.C. § 203(k).

The lists are not exhaustive. *Meza*, 720 F.3d at 583. Among examples of drivers who may qualify as exempt outside sales employees in § 541.504(c)(1) is "A driver who provides the only sales contact between the employer and the customers visited, who calls on customers and takes orders for products, who delivers products from stock in the employee's vehicle or procures and delivers the product to the customer on a later trip, and who receives compensation commensurate with the volume of product sold."

The combination exemption combines other exemptions as described in 29 C.F.R. § 541.708:

> Employees who perform a combination of exempt duties as set forth in the regulations in this part . . . may qualify for exemption. Thus, for example, an employee whose primary duty involves a combination of exempt administrative and exempt executive work may qualify for exemption. In other words, the work that is exempt under one section will not defeat the exemption under any other section.

*Id.* at 786, *quoting* § 541.708. The Secretary of Labor explains that the purpose of this combination exemption was to deal with "'the situation that exists when an employee does not meet the primary duty requirement of any individual exemption. . . . Thus, an employee performing duties that fall under more than one individual exemption, none of which separately represents her primary duty, may be exempt under the combination exemption if those duties, when combined, constitute her primary duty.'" *Id.*, *quoting IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 294 (4th Cir. 2007).

"It is 'a mechanism for cobbling together different exempt duties for purposes of meeting the primary-duty test.'" *Id., citing id.* The employee must still satisfy the other requirements of each exemption whose duties are combined, e.g., "an employee with administrative job functions constituting part of her 'primary duty" . . . must also meet[] the administrative exemption's salary requirement." *IntraComm*, 492 F.3d at 294. *See also Dalheim*, 918 F.2d at 1232, in which the Fifth Circuit opined that the combination exception applies "only where (1) an employee performs more than one type of work that would be exempt except that (2) neither type of work alone can be termed the employee's primary duty, but (3) all of the putatively exempt work taken together constitutes the employee's primary duty."   If an employee does satisfy the primary duty requirement of an individual exemption, the combination exemption is not applicable. *King*, 11 F. Supp. 3d at 786.

The employer bears the burden of proving that a plaintiff is properly classified as an exempt employee. *Corning Glass Works v. Brennan*, 417 U.S. 190, 209 (1974); *Dalheim,* 918 F.2d at 1224; *Johnson v. Big Lots Stores, Inc.*, 604 F.  Supp. 2d 903, 907 (E.D. La.  2009).   Whether plaintiffs are misclassified under the regulatory criteria established by the Secretary of Labor for each applicable exemption requires a fact-intensive inquiry, made on a case-by-case basis, in light of the totality of the circumstances.

-33-

*Big Lots Stores, Inc.*, 604 F.  Supp. 2d at 908.

M-I asserts the affirmative defenses not only of the administrative, outside sales, and combination exemptions to the FLSA, but also of good faith under 29 U.S.C. §§ 259(a) and 260[16] for itself.  Section 259(a) provides an affirmative defense to liability under the FLSA if "the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order or interpretation of the Wage and Hour Division of the Department of Labor.  "[A]n employer who violates the FLSA is liable for liquidated damages equal to the unpaid overtime unless the court finds that the employer acted in good faith and had reasonable grounds to believe that his actions complied with the statute and therefore declines to award or reduces the amount of the liquidated damages." *Ford v. Houston I.S.D.*, ___ F.3d ___, No. Civ. A. H-13-2598, 2015 WL 1246780, at *3 (S.D. Tex. Mar. 18, 2015), *citing Stokes v. BWXT Pantex, LLC*, 424

---

[16] Section 260 ("Liquidated damages") provides,

In any action commenced prior to or on or after May 14, 1947 to recover unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended [19 U.S.C. § 201, *et seq.*], if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title.

-34-

Fed. Appx. 324, 326 (5th Cir. 2011), *citing* 29 U.S.C. § 260.  "The purpose of section 260 is to allow the court to lessen the harshness of the liquidated damages provision by imposing merely compensatory damages." *Big Lots Stores,* 604 F. Supp. 2d at 925, *citing Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 469 (5th Cir. 1979).  The employer bears the burden of proof of showing that it acted in good faith.  *Ford v. Houston I.S.D.,* 2015 WL 1246780, at *3.

*Judicial Estoppel*

"Judicial estoppel is 'a common law doctrine by which a party who has assumed one position in his pleadings may be estopped from assuming an inconsistent position.'" *In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999), *quoting Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir. 1988).  The aim of the doctrine is "'to protect the integrity of the judicial process' by 'preventing parties from playing fast and loose with the courts to suit the exigencies of self interest.'" *Id., citing id.*  "Because the doctrine is intended to protect the judicial system, *rather than the litigants*, detrimental reliance by the opponent of the party against whom the doctrine is applied is not necessary. *Id., citing Matter of Cassidy*, 892 F.2d 637, 641 & n.2 (7th Cir.), *cert. denied*, 498 U.S. 812 (1990).  "'The policies underlying the doctrine include preventing internal inconsistency, precluding litigants from playing fast and loose with the courts, and

prohibiting parties from deliberately changing positions according to the exigencies of the moment.'"  *Id.* at 206, *quoting U.S. V. McCaskey*, 9 F.3d 368, 378 (5th Cir. 1993).  "The doctrine is generally applied where 'intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice.'"  *Id., citing Scarano v. Central R. Co.*, 203 F.2d 510, 513 (3d Cir. 1953).  Courts usually place two limitations on the application of judicial estoppel:  "(1) it may be applied only where the position of the party to be estopped is clearly inconsistent with its previous one; and (2) that party must have convinced the court to accept that previous position. *Id., citing U.S. for use of American Bank v. C.I.T. Construction Inc. of Tex.*, 944 F.2d 253, 258 (5th Cir. 1991).  Many courts require that the party to be estopped acted intentionally, not inadvertently; "'if incompatible positions are based not in chicanery, but only on inadvertence or mistake, judicial estoppel does not apply.'".  *Id., quoting Johnson v. State, Oregon Dept. of Human Resources, Rehabilitation Div.*, 141 F.3d 1361, 1369 (9th Cir. 1998).  The Fifth Circuit requires that three factors must be satisfied in order to invoke the doctrine of judicial estoppel:  "(1) the party's position must be clearly inconsistent with its previous one;  (2) the court must have accepted the party's earlier position; and (3) the non-disclosure must not have been inadvertent." *Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380, 386 (5th Cir. 2008), *quoting*

*Coastal Plains*, 179 F.3d at 205.

### Casey's Status as a Plaintiff

The Court first addresses the issue of whether Casey is properly a Plaintiff in this lawsuit. M-I argues that because this action was never even conditionally certified as a collective action (and the time to move to do so has expired), because Casey has opted in only as a collective action participant, and because Dewan has never moved to amend to name Casey as a Plaintiff, Casey has not appeared as a named party and his claims should be severed and dismissed. Alternatively, if the Court considers Casey's claims on the merits, they should be dismissed for the same reasons as Dewan's.

Dewan and Casey argue that conditional class certification is not necessary or sufficient for a representative action to exist under the FLSA because Congress expressly conferred on employees "the right . . . to become a party to any [collective] action." 29 U.S.C. § 216(b). Parties may opt-in by filing consents before as well as after conditional certification, or even if no class certification is requested.[17]  They further urge that if the Court

---

[17] Dewan and Casey cite Judge Rosenthal's opinion, *Granchelli v. P&A Interests, Ltd.*, H-11-4514, 2013 WL 435942 (S.D. Tex. Feb. 4, 2014) to argue that they should be allowed to go forward as named Plaintiffs in a representative action because Casey opted into the putative collective action.  While the named plaintiff in *Granchelli* failed to move timely for conditional certification, a key distinction from the instant suit is that he moved to amend the complaint to convert the opt-in plaintiff into a named plaintiff under Federal Rules of Civil Procedure 15(a) and 16(b) and for

nevertheless determines that Casey is not a party here, it should dismiss him from the suit and toll his statute of limitations from December 14, 2012, the day he filed his consent, until thirty days after he is dismissed so that he may refile his claims.[18]

The question of the status of an opt-in plaintiff when there is no conditionally certified collective action under the FLSA has resulted in a conflict among courts. There is no dispute here that although the Original Complaint, filed on December 14, 2012 in H-12-3638,[19] states that Dewan is bringing this suit as a collective action, and although William J. Casey filed his consent to join a collective class action that same day (#2), Dewan has never moved to conditionally certify a collective action, and thus the two-stage *Lusardi* test was never applied.

_____

permissive joinder of him as a plaintiff under Rule 20(a). Judge Rosenthal granted the motions and ordered the two plaintiffs to file an amended complaint. Similarly, in Dewan and Casey's other cited case, *Muhammad v. GBJ, Inc.*, Civ. A. No. H-10-2816, 2011 WL 2357369. at *2 (S.D. Tex. June 11, 2011), Judge Rosenthal also granted a timely motion to amend.

[18] Dewan and Casey cite *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 511-12 (M.D. La. 2005)(to protect claims of plaintiffs who sought to join in the proposed collective action, after denying certification of a collective action, the court allowed each opt-in plaintiff with an individual claim to file suit within 30 days).
This Court notes that the district court in *England* applied the two-step process established in *Mooney* and *Lusardi*, discussed *infra*, in denying certification of a conditional class.

[19] Originally designated H-12-3638, this case was transferred to the Eastern District of California on July 24, 2014 (#53), and then transferred back on June 19, 2015, when it was given the above referenced new number, H-15-1746 (#84).

Some courts have held that an opt-in plaintiff in a FLSA case where no class has been certified or where the conditionally certified class has been decertified must be dismissed without prejudice, as he has opted into a nonexistent class, not into the original lawsuit, and therefore only the original named plaintiff in the suit proceeds.  *See e.g.*, *Mooney v. Aramco Services Co.*, 54 F.3d 1207, 1214 (5th Cir. 1995)("If the claimants are not similarly situated, the district court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice."), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 90-91 (2003); *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 567 (E.D. La. 2008)(decertifying collective action and dismissing without prejudice "the claims of all opt-in plaintiffs, leaving before the Court the named plaintiffs who originated these actions"); *Odem v. Centex Homes*, Civ. A. No. 3:08-CV-1196 L, 2010 WL 424216, at *2 (N.D.  Tex.  Feb. 4, 2010)(denying motion for conditional certification of an FLSA collective action and dismissing opt-in plaintiffs without prejudice); *Clay v. Huntington Ingalls, Inc.*, Civ. No. 09-7265, 2012 WL 860375, at *3 (E.D. La. Mar. 13, 2012)(After judge denied class certification, "[T]o now allow the Opt-in Plaintiffs to be converted to named plaintiffs would violate the policies and practical considerations underlying the decision not to certify the collective action in the first place."); *Quijano v. Tuffy Associates Corp.,* No. 2:13-cv-573-FtM-38CM, 2014 WL 4183691, at *2 (M.D. Fla. Aug. 21, 2014)(where plaintiff failed to move for conditional certification, the court granted Defendant's

motion to dismiss opt-in plaintiff without prejudice and struck collective action allegations from plaintiffs' complaint); *McGlathery v. Lincare*, No. 8:13-cv-1255-T-23TBM, 2014 WL 1338610, at *4 (M.D. Fla. 2014)(after plaintiffs failed to move for certification of a collective action and requested the court to convert the opt-in plaintiffs to named plaintiffs, the court dismissed claims of opt-in plaintiffs without prejudice, stating "once the possibility of class certification passes . . . opt-in plaintiffs are dismissed without prejudice").

Other courts have concluded that opt-in plaintiffs filing written consents under the FLSA have the same status as the named plaintiff. In *Alfonso v. Straight Line Installations, LLC*, No. 6:08-cv-1842-Orl-35DAB, 2010 WL 519851 (M.D. Fla. Sept. 29, 2010), two parties not named in the complaint consented to join a putative collective action under the FLSA, but the plaintiff did not file a motion to proceed as a collective action. The *Alfonso* court observed that individuals who already know about the suit and want to join as plaintiffs do not have to wait for certification and notice to do so. 2011 WL 519851, at *1; *see also Granchelli*, 2013 WL 435942, at *2 . It then granted the named plaintiff leave to amend both the complaint and the scheduling order under Rules 15(a) and 16(b) to add the two as named party Plaintiffs.[20]   The district

---

[20] The district court in *McGlathery*, 2014 WL 1338610, at *2, emphasized that *Granchelli* did not "promote[] converting as a matter of course an opt-in plaintiff into a named plaintiff," but

court, citing *Prickett v. Dekalb County*, 349 F.3d 1294, 1297 (11th

Cir. 2003),[21] opined, "[O]nce opt-in plaintiffs consent to join,

'opt-in plaintiffs should have the same status in relation to the

claims of the lawsuit as do the named plaintiffs'" and "[a] motion

to proceed as a collective action is not required for an opt-in

plaintiff to be considered a party plaintiff; rather, the benefit

of a collective action is providing putative class members accurate

and timely notice and the opportunity to opt-in." *Id.* at *1.  *In*

*accord, Granchelli*, 2013 WL 435942, at *2, *citing Alfonso*  and

*Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1259 (11th Cir.

_____

instead permitted "the conversion only after granting the
plaintiff's motion to amend the complaint.  This approach . . .
best comports with the 'two-tiered approach' to FLSA-class
certification . . . ."  Other courts, discussed above, do not
require such amendment of the complaint.

    [21] In *Prickett*, 349 F.3d at 1297, the Eleventh Circuit opined
about the express intent of Congress in 29 U.S.C. § 216(b)("No
employee shall be party plaintiff to any such action unless he
gives his consent in writing to become such a party . . . ,"),

        That plain language indicates that plaintiffs do not opt-
        in or join an action as to specific claims, but as to the
        action as a whole.  The statute does not indicate that
        opt-in plaintiffs have a lesser status than named
        plaintiffs insofar as additional claims are concerned.
        To the contrary, by referring to them as "party
        plaintiff[s][,]" Congress indicated that opt-in
        plaintiffs should have the same status in relation to the
        claims of the lawsuit as do the named plaintiffs.

The appellate court pointed out that this interpretation also
serves Congress' purpose in authorizing the opt-in requirement for
FLSA collective actions to avoid multiple lawsuits where numerous
employees have purportedly been harmed by a claimed violation or
violations of the FLSA by the same employer.  *Id.*

2008)("The action proceeds throughout discovery as a representative action for those who opt-in" and granting a *Granchelli* Rule 20(a) joinder), *cert. denied*, 558 U.S. 2009)); *Palmer v. Priority Healthcare, Inc.*, Civ. A. No. 3:13CV480TSL-JMR, 2013 WL 5771662, at *3 (S.D. Miss. Oct. 24, 2013)(same:  "Collective-action certification is not necessary for multiple plaintiffs to jointly maintain an FLSA action.  The purpose of FLSA collective-action certification is to determine whether the court should allow the plaintiff to send notice to potential opt-in plaintiffs," which is "'only the district court's exercise of discretionary power . . . to facilitate the sending of notice to potential class members'"; "allowing additional plaintiffs to join an FLSA action before or without collective-action certification is consistent with the statutory language."); *Coan v. Nightengale Home Healthcare, Inc.*, No. 1:05-CV-0101-DFH-TAB, 2006 WL 1994772, at *2 (S.D. Ind. July 14, 2006)("Under the opt-in procedures of 29 U.S.C. § 216(b) all 66 of the plaintiffs have affirmatively opted in as plaintiffs in this case, and they are full parties for all purposes.  The original plaintiffs are no longer representing the additional plaintiffs; they are all plaintiffs."); *Alvarado v. Wang Ma LLC*, No. SA:13-CV-944-DAE, 2015 WL 919818, at *2 (W.D. Tex. Mar. 3, 2015)(finding "an amendment is not absolutely necessary," but granting Plaintiff's unopposed motion for leave to amend to add named plaintiffs).

Given its remedial purposes, courts generally "construe the

FLSA liberally in favor of employees." *McGavock v. City of Water Valley, Miss.*, 452 F.3d 423, 425 (5th Cir. 2006), *citing Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960).   Accordingly, this Court follows the second group of cases and permits Casey to remain as a party plaintiff.   Because M-I's alternative motion to dismiss represents that substantively Casey's claims should be dismissed for the same reasons as Dewan's and because the current record and the pending motions will allow the Court to determine whether Casey's claims should go forward, the Court does not request an additional motion and briefing from Dewan or M-I.

**Plaintiffs' Motion for Partial Judgment on the Pleadings as to Certain Affirmative Defense (#48)**

In their motion for partial judgment on the pleadings, Plaintiffs contend that the affirmative defenses of the administrative, outside sales and/or combination exemptions and the good faith exemption are not adequately pleaded here and should be dismissed under Rules 12(c) and 12(b)(6) and *Iqbal.*

M-I's First Amended Answer, timely filed on April 29, 2013, with leave of Court and with no opposition from Plaintiffs, alleges the following substantive affirmative defenses (#24 at pp. 6-7), which, Plaintiffs argue, do not state a claim for relief that is plausible with regard to any of M-I's exemption defenses:

> 4.  The Defendant made reasonable, good-faith efforts to comply with, and not to violate, the [FLSA]; any alleged violations of law were not willful; the Defendant acted in good faith, with reasonable grounds for believing that

its action or inactions or omissions were not in violation of the FLSA based on its understanding that the position meets the requirements of one or more FLSA overtime exemptions; and any complained-of act or omission was in good-faith conformity with and in reliance on applicable law.

. . . .

9.   Plaintiff and the putative class were exempt employees under the Professional,[22] Administrative,

---

[22] Title 29 U.S.C. § 213(a)(1) provides that any employee "employed in a bona fide . . . professional capacity" is exempt from the general rule requiring overtime compensation." 29 C.F.R. § 541.300, addressing "General rule for professional employees," defines "employee employed in a bona fide professional capacity" in section 13(a)(1) as any employee

(1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . . ;

(2) Whose primary duty consists of the performance of work

   (I) Requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction; or

   (ii) Requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor.

29 C.F.R. § 541.301 addresses the exemption for "learned professionals and in relevant part provides,

(a) To qualify for the learned professional exemption, an employee's primary duty must be the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction.  This primary duty test includes three elements:

   (1) The employee must perform work requiring advanced knowledge;

   (2) the advanced knowledge must be in a field of science or learning; and

-44-

Outside Sales and/or Combination exemptions to the FLSA,

> (3) The advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction.

(b) The phrase "work requiring advanced knowledge" means work which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work. An employee who performs work requiring advanced knowledge generally uses the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances. Advanced knowledge cannot be attained at the high school level.

(c) The phrase "field of science or learning" includes the traditional professions of law, medicine, theology, accounting, actuarial computation, engineering, architecture, teaching, various types of physical, chemical and biological sciences, pharmacy and other similar occupations that have a recognized professional status, as distinguished from the mechanical arts or skilled trades where in some instances the knowledge is of a fairly advanced type, but is not a field of science or learning.

(d) The phrase "customarily acquired by a pronged course of specialized instruction" restricts the exemption to professions where specialized academic training is a standard prerequisite for entrance into the profession. The best prima facie evidence that an employee meets this requirement is possession of the appropriate academic degree. However, the word "customarily" means that the exemption is also available to employees in such professions who have substantially the same knowledge level and perform substantially the same work as the degreed employees, but who attained the advanced knowledge through a combination of work experience and intellectual instruction. . . .

In its motion for summary judgment (#31-2, p. 2 n.1), M-I clearly states that Drilling Fluid Specialists or "mud engineers" are not degreed engineers and M-I is not asserting that Dewan (or Casey) is exempt under the professional exemption of the FLSA. Thus the Court concludes that the professional exemption does not apply in this case.

based on the extensive training required to perform their duties and because their actual duties include, among other things, exercising the independent judgment and discretion with respect to drilling fluid testing, interpreting data related to drilling fluids levels and quality, managing drilling fluid levels and quality, identifying problems and the manner in which to correct them, making recommendations as to optimizing equipment performance, in exercising their authority to shutdown a well for safety reasons, and in writing procedures for mixing fluids and handling of product. Plaintiff's and the putative class' duties also include selling and facilitating the sale of services and products to clients. Further, either Plaintiff or some or all of the putative class are highly compensated employees.

Plaintiffs further contend that M-I's exemption defenses should be dismissed with prejudice because both the pleading and discovery deadlines have passed.

M-I's opposition to Plaintiffs' motion does not rest on the merits of the motion, but focuses on the procedural violations surrounding it. M-I explains that after M-I filed its original answer (#6) on February 19, 2013, on March 12, 2013 Dewan filed a Rule 12(f) motion to strike Defendant's Affirmative Defenses (#14) in that document on the grounds that M-I failed to identify the exemption defenses and the basis for them, while M-I's good faith defense did not satisfy *Iqbal*. M-I and Dewan subsequently agreed to allow M-I to file an amended answer that abandoned some of its previous affirmative defenses and provided factual support for others (#51, Ex. 1, Declaration of Martin J. Regimbal, ¶¶ 1-2; Ex. 2, Declaration of Robert P. Lombardi, ¶¶ 1-2). Dewan then sent correspondence (#51, Ex. 1, ¶ 3; Ex. A to Ex. 1, e-mail dated March

-46-

25, 2013) to the Court's case manager indicating that Dewan was unopposed to M-I's pending motion for leave to file an amended answer (#20) and that Dewan would withdraw his motion to strike it (#14).

Meanwhile on April 12, 2013 M-I had filed its unopposed motion for leave to file an amended answer (#21), which was granted on April 29, 2012, and M-I filed its Amended Answer on April 30, 2013, without any opposition from Dewan.   Dewan made no further objections to the defenses in M-I's pleadings.   On September 27, 2013 (#26), given the continuing absence of opposition, the Court issued an order declaring that Dewan's motion to strike was moot.

On April 21, 2014 (#48), approximately six weeks *after* the dispositive motion deadline of March 5, 2014 (see #31) and almost a year after M-I filed its amended answer, Plaintiffs filed their untimely motion for partial judgment on the pleadings.  Before then they had neither asked for an extension of time to contest the amended answer, nor had they provided any reasons to support a continuance, nor had they given any explanation for their substantial delay in challenging M-I's pleading of its affirmative defenses, nor had they ever asked the Court to reconsider the order mooting the motion to strike.  Meanwhile M-I had timely filed its motion for summary judgment (#31) on January 3, 2014, and the deadline for briefing relating to it had also closed more than two months before Plaintiffs filed their motion for partial judgment on

-47-

the pleadings.    #32, Revised Scheduling Order; #42, Summary Judgment briefing deadlines.[23]

M-I maintains that Plaintiffs' conduct over this period suggests an attempt to gain a tactical advantage late in this litigation and raises the question whether they should be judicially estopped from challenging the same defenses on the same grounds that they previously raised and then abandoned.

M-I concludes, #51 at p. 8,

Accordingly, the only reasonable inference is that Plaintiffs saw no issue with the amended pleadings and consented to the sufficiency of [M-I's] defense in the Amended Answer, waived their right to challenge the same now, and should be judicially estopped from taking the inconsistent position in their current motion that [M-I's] FLSA exemption and good-faith defenses were insufficiently pled on the Amended Answer.

Furthermore, M-I argues that Plaintiffs' Rule 12(c) motion should have been brought under Rule 12(b) or Rule 56 because it seeks judgment based the contention that M-I's affirmative defenses are inapplicable on the merits, but it argues instead that the defenses are procedurally defective.  In other words, they conflate the purposes of Rule 12(b)(6)(which does not seek to determine the substantive merits) and Rule 12(c)(which is theoretically directed

---

[23]    Furthermore the Court transferred the case to the Eastern District of California on June 23, 2014, where it remained for nearly a year without a ruling by the district judge there, until it was transferred back here on June 19, 2015, but assigned to a different judge and only reassigned to this Court on August 14, 2015.  This Court was not made aware of the still pending motions for summary judgment and judgment on the pleadings until M-I filed its Joint Notice of Pendency of Motions (#98) on October 21, 2015.

towards a determination of the substantive merits).  5C Wright, *et al.*, § 1369.   Because summary judgment is a better tool for deciding the substantive merits, and because these issues have been raised in briefing relating to M-I's timely-filed motion for summary judgment, M-I maintains there is no need to convert Plaintiffs' Rule 12(c) motion to one under Rule 56.

**Court's Decision on Motion for Judgment on the Pleadings**

In their motion for judgment on the pleadings, Plaintiffs apply the *Twombly-Iqbal* heightened plausibility standard to the pleading of M-I's affirmative defense, which the Court has rejected in favor of the fair notice standard established by the Fifth Circuit in *Woodfield*, 193 F.3d at 362.  *See* pages 12-15 of this Opinion and Order.  Plaintiffs have not cited any authority for, nor shown that any pleading insufficiency is "clearly apparent" on the face, of any of M-I's affirmative defenses under the "fair notice" standard.  As pointed out by M-I (#51 at p. 14), and the Court agrees, Plaintiffs received more than fair notice of M-I's affirmative defenses.  Not only were they all pleaded in its original answer (#6), as well as its amended answer, and briefed in regard to Plaintiffs' motion to strike, but the administrative, outside sales, and combination exemptions were briefed extensively with respect to M-I's motion for summary judgment, including the salary requirement (M-I's memorandum in support of summary judgment and reply brief, #31-2 and Reply, #50, and Plaintiffs' Response in

Opposition to the motion for summary judgment, #44).  Thus M-I's affirmative defenses, for which M-I has not only given fair notice with supporting facts, may be raised now, at summary judgment and/or trial.

Moreover, the Court agrees with M-I that the motion for partial judgment on the pleadings under Rule 12(c) is not the proper vehicle for challenging M-I's affirmative defenses because they require factual determinations and because they appear to seek a substantive-merits judgment based on an alleged procedural defect.  For example, as M-I points out, "Plaintiffs' conduct over this period suggests an attempt to gain a tactical advantage late in this litigation and raises the question whether they should be judicially estopped from challenging the same defenses on the same grounds that they previously raised and then abandoned," including whether it was intentional or inadvertent.  Also Plaintiffs have not shown that M-I's affirmative defenses are clearly insufficient as a matter of law based on undisputed facts.  That issue is the focus of the motion for summary judgment, where the merits of the affirmative defenses are fully challenged.

Furthermore, M-I argues not only was Plaintiffs' motion for partial judgment on the pleadings untimely filed, but emphasizes that Plaintiffs had never asked for an extension of time to contest M-I's amended answer, nor given any explanation for their failure that might support a continuance or that might excuse their delay

in challenging the re-pleaded affirmative defenses, nor ever asked the Court to reconsider its order mooting the motion to strike the first complaint's affirmative defenses.   In addition, M-I's arguments rest in part on the failure of Plaintiffs to object timely to the repleaded affirmative defenses in M-I's amended answer, or Plaintiffs' failure to challenge them with another Rule 12(f) motion.   As noted, M-I asserts that "the only reasonable inference is that Plaintiffs saw no issue with the amended pleadings and consented to the sufficiency of [M-I's] defense in the Amended Answer, waived their right to challenge the same now, and should be judicially estopped from taking the inconsistent position in their current motion that [M-I's] FLSA exemption and good-faith defenses were insufficiently pled on the Amended Answer."

Disagreeing, the Court emphasizes that under Federal Rule of Civil Procedure 7(a), a plaintiff is not required to respond to affirmative defenses in an initial responsive pleading.  Under Rule 8(d) allegations in a pleading that do not require a response are construed by the court as having been denied. *Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995), *citing* 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 108, at 24; *Radio Shack Corp. v. Radio Shack*, 180 F.2d 200, 206 (7th Cir. 1950).   Thus Dewan's silence after the filing of the amended answer with affirmative defenses did not establish that the affirmative

defenses had merit.   Nevertheless, Plaintiffs' decision not to challenge the affirmative defenses does not excuse the untimeliness of their motion for judgment on the pleadings.

For the reasons stated, the Court denies Plaintiffs' motion for partial judgment on the pleadings.

The Court examines the merits of the affirmative defenses in addressing M-I's motion for summary judgment.

### Defendant's Motion for Summary Judgment (#31)

M-I moves for summary judgment on two grounds:  (1) Dewan, and now Casey, are not entitled to overtime pay because as drilling fluid specialists they qualify as exempt employees under the administrative, outside sales, and/or combination exemptions; and (2) opt-in Plaintiff William J. Casey's claims should be dismissed because this action has never been certified as a collective action and Casey has never appeared as a named party.   The Court has denied the latter ground, and thus addresses the exemption argument with respect to both Dewan and Casey.

M-I is "an industry leader in engineering drilling fluid systems [a/k/a "mud systems"] and additives for oil and gas well drilling operations that improve efficiencies, reduce costs and minimize Health, Safety and Environmental ("HSE") impacts of drilling."  Ex. 1, Decl. of Donnie Van Vrankin[24] at ¶ 3.  As part of its business, M-I employed Drilling Fluid Specialists (a/k/a

_____

[24] M-I employee and Oklahoma District Engineering Manager.

"mud engineers"), including Dewan (from September 2010-early December 2012) and Casey (from November 2011-December 2012), who provide advice and support directly to M-I's clients. *Id.* at ¶¶ 5, 7, 8. Usually during drilling operations the mud engineers are the only M-I employees that interact directly with its clients. *Id.* at ¶ 6.

The evidence shows that a mud system is a crucial part of a drilling operation that performs the following critical functions: (1) stabilizing the drilling hole to keep it from collapsing in on the drill string; (2) lubricating, cooling, and supporting the drill string; (3) removing cuttings from the drill hole; (4) preventing drill string corrosion; (5) powering hydraulic tools at the cutting end of the drill string; (6) constructing a barrier to keep the mud and material in the drill hole from leaking onto the surrounding geological formations, thus minimizing the impact on the environment; (7) preventing unwanted gas and oil from entering into the drill hole during drilling; (8) facilitating cementing and completion; and (9) permitting the drilling crew to drill faster if the drilling mud is properly maintained. Drilling Fluids Engineering Manual ("Manual"), Def.'s Ex. 17 at 2.1 to Dewan's Deposition (#31-4); Dewan's Dep. at 106:16-107:8.

The Manual (Def.'s Ex. 17 at 2.11; Dewan Dep. at 148:6-12) further explains why a mud engineer must constantly monitor and exercise discretion and make significant independent decisions

about what to do in their work[25]:

> Drilling fluid engineering almost always requires tradeoffs in treating and maintaining the properties needed to accomplish the regular functions. [For example], [a] high mud viscosity might improve hole cleaning, yet it might lower the hydraulic efficiency, increase drill solids retention, slow the penetration rate, and change dilution and chemical treatment requirements. Experienced drilling fluid engineers are aware of these tradeoffs and understand how to improve on function while minimizing the impact of mud property changes on other functions.

If the mud is improperly maintained, the results can be severe and even catastrophic. It can result in loss of circulation which can prevent the mud from removing cuttings from the hole (Dewan Dep. at 148:4-9), cause the drilling operations to stop until the circulation is restored (*id.* at 108:21-23), cause a stuck pipe or cause the hole to collapse in on the drill string, also causing a stuck pipe, which would then require costly repairs (*id.* at 108:9-17), lead to intrusion of gas and oil into the hole, which can result in "gas kicks" or explosions (*id.* at 109:14-20), and result in excessive intrusion of drilling mud into the geologic formation,

---

[25] In *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 580, 586 (5th Cir. 2006)(per curiam), the Fifth Circuit held that the fact that insurance adjusters "must consult with manuals or guidelines does not preclude their exercise of discretion and independent judgment"; instead it found the insurance adjusters "exercised discretion in determining coverage, conducting investigations, determining liability and assigning percentages of fault to parties, evaluation bodily injuries, negotiating a final settlement, setting and adjusting reserves based upon a preliminary evaluation of the case, investigating issues that relate to coverage and determining the steps necessary to complete a coverage investigation, and determining whether coverage should be approved or denied.").

which can cause environmental damage (*id.* at 108:24-109:3).  Thus drilling fluid specialists' duties not only related directly to the general business operation of M-I's customers, but they were of substantial importance to both the customers and to M-I.

With supporting evidence, M-I maintains that both Dewan  and Casey are exempt from the overtime pay provision under the administrative, outside sales, and/or combination exemptions.  They were paid on a salary basis, more than the minimum requirement of $455.00 per week, and both received this full salary throughout their employment (Dewan Dep., #31-4 at 68:8-10, 73:7-9; 68:22-24)(Casey Dep., #31-5 at 754:25-755:2;), performed non-manual work directly related to the general business operations of M-I's clients, i.e., drilling companies in the oil and gas industry (Dewan Dep. at 89:7-9; Casey Dep. at 94:10-12), exercised independent judgment and discretion with regard to matters of significant importance to those clients; and worked at the clients' work sites (drilling rigs) and sold product to them.  Both testified that they exercised independent judgment and discretion in managing the mud.

Before drilling began, Dewan testified that he was given a mud plan drafted by an engineer with specifications on historical drilling in the area and with parameters for Dewan to attempt to adjust the mud to meet, but actual conditions in the well bore or drilling hole would vary from those in the plan and required Dewan

to exercise judgment and discretion with respect to additives.
Dewan Dep., 126:6-8, 17-21; 166:1-7; 116:18-118:10; 137:8-14.  To
determine the actual down hole conditions, Dewan would perform a
series of physical and chemical tests on the mud, determine the
physical qualities of the mud in various locations (in the mud
pits, storage, and mixing areas) and at the centrifuges and
shakers, which remove cuttings from the mud.  He would also talk to
the drilling crew about any problems or issues that they were
having.   Dewan Dep. at 23:5-6; 91:2-10; 126:17-21.   After
determining the actual down hole conditions from that data, he
would decide the proper types and amounts of additives to the mud
and would draft recommendations for changes to the mud and drilling
speeds for the client's representative (the "company man"), who was
in charge of the drilling site. *Id.* at 23:6-7; 57:14-17; 90:3-21;
114:13-18; 126:13-127:7; 137:8-14.   Dewan testified that his
recommendations were usually accepted. *Id.* 95:2-19. Dewan worked
independently; he was the only M-I employee and the only mud
engineer on site. *Id.* at 37:19-22.  In essence he was responsible
for the mud for all rigs to which he was assigned. *Id.* at 20-22.
His recommendations would already be implemented before M-I even
received these e-mailed reports. *Id.* at 99:4-15.  Even then, M-I
rarely commented or provided feedback on his reports.  As for his
sales responsibility, Dewan testified that his position allowed him
to recommend M-I products as additives to the mud and to influence

the company man to buy and use them.  Dewan Dep. at 79:19-80:4;
#31-4, Def.'s Ex. 8 (job description of Drilling Field Specialist
II) and Ex. 9 (job description of Fluid Specialist III).[26]  Dewan
would then order the products from M-I's warehouse, receive them at
the drilling site, and supervise their incorporation into the
drilling mud system.

M-I insists that Dewan satisfies the requirements of 29 C.F.R.
§ 541.200(a)(1)-(3) for the administrative exemption:  he was paid
on a salary or fee basis at a rate of not less than $455 per week,
had a primary duty of performing non-manual work directly related
to the management policies or general business operations of the
employer or its customers,[27] and his primary duties included the
exercise of discretion and independent judgment with respect to
matters of significance."  29 C.F.R. § 541.200(a)(1)-(3).

M-I submits Casey's deposition #31-5 to support his claim
that he performed no manual labor (*Id.* at 94:10-12), that his
primary responsibility was managing the mud system to optimize the
drilling rig and prevent catastrophic failures, that his
recommendations to the company man were usually accepted (*id.* at

---

[26] Dewan was hired by M-I as a Drilling Fluids Specialist II
and later promoted to Drilling Fluids Specialist III.  Dewan Dep.
at 73:7-9.

[27] *See* the job descriptions cited in previous footnote.  Dewan
testified that the descriptions accurately describe his primary job
function, which was managing the mud system.  Dewan Dep., 75:20-
76:24 .

129:21-130:6), and that he had little supervision and relied on his own judgment when in the field based on down-hole conditions (*id.* at 151:6-14).  Like Dewan, he would work to convince the client to buy and use M-I products.  *Id.* at 111:7-16.

M-I analogizes the work of Dewan and Casey to that of Work Planners in five nuclear power plants in *Kennedy v. Commonwealth Edison Co.*, 410 F.3d  365 (7ᵗʰ Cir. 2005).[28]  The appellate court described the Work Planners' job duties and determined that they fell under the administrative exemption to overtime pay under FLSA, *id.* aa 368:

> Work Planners are essentially problem solvers.  Whether in the electrical area, the mechanical area, or the instrument area, a Work Planner's primary duty is to prepare and create a "work package."  If something at the plant needs to be repaired, if something needs to be inspected, or if equipment needs to be modified, the Work Planner is responsible for devising the solution to the problem.  He or she first studies the problem and decides what kind of labor, materials, and equipment will be needed for the project.  The Planner may study a computer base to find out what has been done before on similar problems, to see what parts are available, and to review repair procedures.   The Planner may study a computer database to find out what has been done before on similar problems, to see what parts are available, and to review repair procedures.   The Planner may also make a visual inspection of the problem area to verify the exact nature of the problem and to assess the situation personally.  Once the Planner has written up the proposed work package, she submits it to another Work Planner for technical review.  Further review after that step is also

---

[28] M-I notes that *Kennedy* was decided under the pre-2004 regulations, but the analysis is applicable to the current regulations and *Kennedy* continues to be cited as authority.  *See , e.g., Zelenika v. Commonwealth Edison Co.*, No. 9-2946, 2012 WL 3005375 (N.D. Ill. July 23, 2012).

possible.

The *Kennedy* court, 410 F.3d at 373, drawing on the "production v. administrative dichotomy," pointed out that "The role the Planners take in repairs and modifications is both to map out solutions to a particular problem and to advise on future actions. The mere fact that their advice and planning relates directly to plant operations is not enough to make them, personally, the actual production employees."   M-I analogizes the production line of turbines and generators that produced electric power in *Kennedy* to M-I's customers' "production line" of drilling rigs that "produce" wells for the extraction of gas and oil.   Like the Work Planners, Dewan did not work on a production line, but instead provided advice and recommendations regarding problems and optimizing the mud system's operations that would then be implemented by production line workers.

M-I also analogizes the facts here to those in *Carbaugh v. Unisoft Int'l Inc.*, Civ. A. H-10-0670, 2011 WL 5553724, at *23-24 (S.D. Tex. Nov. 15, 2011)(Lake, J.),[29] in which the employer claimed

---

[29] *Carbaugh* at 22 cites *inter alia Verkuilen v. MediaBank LLC*, No. 09-C-3527, 2010 WL 3003860, at *2 (N.D. Ill. July 27, 2010)(holding that employee who provided service and support to customers who bought her employer's software fell under the administrative exemption upon concluding that employee exercised discretion because "when confronted with a client's problem in using [her employer's] software, [the employee] determined the nature of the problem and how to handle it"), *aff'd*, 646 F.3d 979, 981 (7th Cir. 2011)("[I]t is apparent that our plaintiff is a picture perfect example of a worker for whom the Act's overtime provision is not intended."), *Cruz v. Lawson Software, Inc.*, 764 F.

that Carbaugh was exempt under the administrative exemption to the FLSA's overtime requirements.  Similar to Dewan, Carbaugh traveled by himself to the customer's premises with varying hours for the installation, testing, and initial operation of software purchased by his employer's client from his employer.  While on the client's premises, Carbaugh functioned as an intermediary between the client's employees, who needed to learn to master the complex software, and the employer's software developers.  Carbaugh would identify the customer's needs, translate them into specifications to be implemented, and help the employees with the implementation. The court found that Carbaugh's primary duty was the performance of work directly related to the management or general business operations of his employer's customers and observed, "[E]mployees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt."  2011 WL 5553724, at *21. Dewan, too, served as a

---

Supp. 2d 1050 (D. Minn. 2011)(holding that the discretion to make recommendations can suffice to establish the "exercise of discretion and independent judgment" element of the administrative exemption); and *Koppinger v. Am. Interiors, Inc.*, 295 F. Supp. 2d 797, 802 (N.D. Ohio 2003)("[T]he record establishes that plaintiff's work with defendant was nonmanual work directly related to the general business operation of defendant.  Plaintiff's deposition establishes that his position involved maintaining, upgrading, and administrating the computer system.  While some of his work may be considered manual in that he necessarily had to perform some physical actions (installing hardware/software, etc.), those actions do not negate the exemption because plaintiff's deposition testimony establishes the prominence of the problem-solving, planning, and purchasing duties.").

consultant to his employer's customers, assessed the mud system's needs through a series of variables, and then customized the mud system to meet those needs.[30]

In sum, M-I argues that, as shown, Dewan's duties were of substantial importance to M-I's customers, not only in avoiding catastrophic consequences, but in saving substantial amounts of money or avoiding substantial costs; he exercised discretion and independent judgment in performing his primary duty as the only mud engineer on site, using input from different kinds of tests that had to be interpreted, reports from operators, and his own observation, and reacting to numerous variables with regard to the mud, conditions in the well bore, etc., making tradeoffs among the various functions of the mud, and choosing which additives to introduce into the mud to attain the desired level of performance. Dewan rarely saw a supervisor and while he forwarded his mud

---

[30] In its reply brief, M-I also quotes from *Gallegos v. Equity Title Co. of Am., Inc.*, 484 F. Supp. 2d 589, 594 (W.D. Tex. 2007), on which Plaintiffs rely:

[The phrase "directly related to management policies or general business operations of his employer or his employer's customers] is not limited to persons who participate in the formulation of management policies or any operations of the business as a whole . . . . The test of "directly related to management policies or general business operations" is met by many persons employed as advisory specialists and consultants of various kinds, credit managers, safety directors, claims agents and adjusters, wage rate analysis, tax experts, account executives of advertising agencies, customers' brokers in stock exchange firms, promotion, and many others.

reports and recommendations to M-I's office, his recommendations
were implemented by the rig operator before he received any
feedback.

Like Dewan's, Casey's weekly salary exceeded the minimum $455
per week, he admits that he performed no manual work and that his
primary responsibility was to manage the mud system, he determined
what adjustments were to be made to the mud, his recommendations to
the company man were generally accepted, and that he had minimal
supervision and relied on his own judgment when in the field.
Casey Dep., #31-5 at 54:25-55:2, 94:10-12, 93:22-24; 129:21-130:6,
151:6-14, 170:18-171:6.

M-I further maintains that Dewan also falls under the outside
salesman exemption.  29 C.F.R. § 213(a)(1) defines an "outside
salesman" as one whose primary duty is either "making sales within
the meaning of section 3(k) of the Act" or "obtaining orders or
contracts for services or for the use of facilities for which a
consideration will be paid by the client or customer," and "who is
customarily and regularly engaged away from the employer's place or
places of business in performing such primary duty."  29 C.F.R. §
541.500.  It is undisputed that Dewan regularly worked away from M-
I's offices.  Having shown that Dewan promoted and sold M-I's
products to customers, M-I confronts the question whether Dewan's
primary duty was "making sales."  It argues that in order to
perform his primary duty of ensuring that the drilling fluid system

operated at a optimal level meeting the needs and expectations of the client's company man (i.e., "managing the mud system") by monitoring data from numerous sources, using his own professional judgment, and adding materials to the mud, Dewan had to decide to which materials to use and to order them from M-I.  Thus his role as a salesman of M-I additives and products cannot be separated from his responsibilities as mud engineer.  Dewan Dep. (#31-4, at 114:22-25, 125:9-17, 126:17-21, 127:2-7, 128:8-19.  Moreover, as the on-site client contact, after assessing what equipment the drill site might need, Dewan also recommended that the company man purchase additives and equipment from M-I rather than from competitors, and he frequently placed orders for them.  *Id.* at 79:7-80:14; 23:10-11, 104:25-105:3.  *See also* FSII job description, Def.'s Ex. 8 to Dewan Dep.

M-I further urges that Dewan performed duties similar to those of "Drivers Who Sell" under 29 C.F.R. § 541.504 when he conducted "drive-bys" to clients' drilling sites and viewed mud reports, checked the condition of the mud, talked to company men, and recommended additives or products to be incorporated into the mud system.  Dewan Dep. at 90:3-10, 90:22-91:1.

Casey, who operated under the same job description as Dewan, testified that he also promoted M-I products and ordered only M-I products for the clients' drilling sites directly from M-I's warehouse.  Casey Dep. at 109:17-110:9, 110:2-6; 111:10-16; 112:2-

-63-

4; 93:12-14.   M-I asserts that Casey also performed duties like those of drivers who sell, visiting rigs, making recommendations, and placing orders for product.  *Id*. 25:11-12; 129:21-130:6.   M-I here too emphasizes the "inexorable connection between Dewan and Casey's sales responsibilities and their duty to ensure the efficient operation of the drilling fluid system" and concludes that their "sale of M-I products and equipment was part of their primary duty of managing the mud system."   #31-2 at p. 26. Therefore, contends M-I, Dewan and Casey fall under the combined exemption and the Court can aggregate the sales work with the administrative work because neither Dewan's nor Casey's primary duty was solely administrative or solely outside sales, but instead a combination of their exempt duties.

### Plaintiffs' Response (#44)

Regarding M-I's claim that Dewan and Casey's work falls under the administrative exemption, Plaintiffs first examine "the commodity or commodities, whether goods or services, that [M-I] exists to produce and market."   *Dalheim*, 918 F.2d at 1230. Plaintiffs point out that other courts have found, and M-I has judicially admitted,[31] that it is an "oilfield contractor which

---

[31] Plaintiffs assert that M-I therefore should be collaterally estopped from relitigating these facts.  *See, e.g., Bradberry v. Jefferson Co., Tex.*, 732 F.3d 540, 548 (5th Cir. 2013)("[T]he doctrine of collateral estoppel . . . prevents the same parties or their privies from relitigating issues that were litigated and decided in a prior action.").  In reply (#50 at p. 8 n.6), M-I objects.  A mud engineer's status for FLSA purposes was not

provides drilling fluid and [related] services to oil companies."
*Pipkin v. M-I, LLC*, Civ. A. No. 04-2532, 2006 WL 2092399, *1 (E.D.
La. July 26, 2006)("provides drilling fluids and services to oil
companies drilling offshore"); *Pillette v. M-I LLC*, Civ. A. No. 11-
2300, 2012 WL 5349386, at *1 (E.D. La. Oct. 29, 2012)("supplying
deep water drilling rigs in the Gulf of Mexico with drilling
fluids"), *affd*, 544 Fed. Appx. 461 (5th Cir. May 28, 2013);
Plaintiffs' Complaint (#1 ¶ 9). M-I has stated that drilling mud,
with related services, is its "sole product." Appendix, #46, tab
11, *Pilette* motion for summary judgment at pp. 3-5; Appendix, #46,
tab 13, *Pipkin* motion for summary judgment at pp. 5-6. Because
Dewan and Casey provide the income-generating service that M-I
"exists to produce and market," *Dalheim*, 918 F.2d at 1230,
Plaintiffs contend that they fall squarely on the production side
of the production/administration dichotomy and cannot be exempt
under 29 U.S.C. § 213(a)(1) and 29 C.F.R. §§ 541.200-541.204 as
administrative employees. See also #46, Tab 17, Dep't Lab. WH Op.
Letter No. FLSA2005-21 (Aug. 19, 2005)("non manufacturing employees
can be considered 'production' employees if their job is to
generate (i.e., 'produce') the product or service that the
employer's business offers the public"). Dewan and Casey, as mud

---

litigated in the cases cited by Plaintiffs, and M-I has not been
inconsistent: Plaintiffs have noted that M-I argued that mud
engineers are trained individuals who monitor down hole conditions
and make recommendations to the client. #44 at pp. 19-20.

engineers for M-I, "generate (i.e., produce) the product or service that [M-I] offers the public" and therefore are production employees. Their duty is not related to the management or general business operations of M-I or its customers.

Even if their duties do not fall squarely on the production side, they do not relate to the management or general business operations of M-I or its customers and they are therefore not administrative, insist Plaintiffs. Both Dewan and Casey testified that their primary duty was to ensure that the properties of the drilling mud stay within the specifications set forth in the mud plan. #44, Ex. M, Dewan Dep. 165:19-168:9 (mud engineers "babysit" drilling mud and ensure it stays within predetermined specifications; Ex. N, Casey Dep. 161:163:15 (same). *See also Bottell*, 299 F.3d (performance of non-manual work must be directly related to management policies or general business operations, i.e., running the business itself or determining its overall course or policies, not just the day-to-day carrying out of the business' affairs). Plaintiffs argue that mud engineers perform work specific to M-I and its customers' industry, not work that every employer needs performed because it is in business generally. Citing supporting documentation, they assert that the mud engineer position is entry level, requiring only a high school education and passage of drug tests and a physical. Those hired then complete an eight-week training program ("mud school") at M-I's offices in

Houston, Texas, where they are instructed on the functions of drilling fluids, their physical and chemical properties, mathematics, and trained in the correct use of testing equipment and computers software.  They do not receive any sales training nor do they sell anything.  Nor are they involved in the creation of mud plans, which are created by trained, experienced engineers working in M-I's offices. Nor do mud engineers have any authority to diverge from those mud plans.  Plaintiffs maintain that mud engineers are "employee[s] with limited technical training who, by using standard tests and calculations, determine[] the additives necessary to maintain the consistency of the drilling mud formulated for the well." *Dresser Industries, Inc. v. Sandvick*, 732 F.2d 783, 784 (10th Cir. 1984).[32]  These duties are fundamentally different from those listed in 29 C.F.R. § 541.201(b) and are not administrative.[33]

Furthermore, contend Plaintiffs, even if Dewan and Casey had administrative duties, M-I has failed to demonstrate that they exercised discretion and independent judgment regarding matters of significance under 29 C.F.R. § 541.200(a)(3).  Plaintiffs characterize as "sophistry in its purest form" M-I's claim that if

---

[32] This Court notes that *Sandvick* did not deal with the FLSA and exemptions to its overtime provisions, but instead the breach of a covenant not to compete and which state law applied to it.

[33] In reply, M-L points out that *Sandvick* only litigated the applicability of a noncompetition agreement, not mud engineers' FLSA status or their primary responsibilities.  #50 at p. 16.

the mud engineers fail to perform their duties, the result would be potentially catastrophic.   #44 at p. 26.   They argue that the Department of Labor does not simply mean that an employee's failure to perform certain duties will cause harm.   29 C.F.R. § 541.202(f) states,

> An employee does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform the job properly.   For example, a messenger who is entrusted with carrying large sums of money does not exercise discretion and independent judgment with respect to matters of significance even though serious consequences may flow from the employee's neglect.   Similarly, an employee who operates very expensive equipment does not exercise discretion and independent judgment with respect to matters of significance merely because improper performance of the employee's duties may cause serious financial loss to the employer.

See also Burke v. County of Monroe, 225 F. Supp. 306, 319-21 (W.D.N.Y. 2002)(finding computer administrators were not exempt even though pressing the wrong button could disrupt operations). Plaintiffs maintain that failure of an assembly-line worker to properly install widgets on an automobile might ultimately cause product failure or even the death of the driver, but that fact does not make his job "significant" for purposes of the administrative exemption.   Similarly a life guard who fails to perform the requisite daily quality tests for an adequate chlorine level on the pool water could cause the spread of disease, but that fact does not make testing the water a "matter of significance."

Plaintiffs also charge M-I with misrepresenting a mud

engineer's discretion and independent judgment. They assert that
before drilling begins, trained engineers working at M-I's district
offices (not mud engineers) work with M-I's customers to develop
mud plans for each well based on historical drilling in the area,
and they include acceptable parameters for drilling mud. Def.'s
Mem. Supp. Sum. J., #31-2 at p. 4; Ex. M, Dewan Dep. (#44-6) 166:8-
167:1,168:25-169:14. The mud engineers, on the other hand, are
responsible for making sure the properties of the drilling mud stay
within specifications set forth in the mud plan. Ex. M (#44-6),
Dewan Dep. 165:19-168:9 (mud engineers "babysit" drilling mud and
make sure it stays within the mud plan's specifications); Ex. N,
Casey Dep. 161-163:15 (same). Plaintiffs contend that mud
engineers lack authority to diverge from the mud plans. Ex. M
(#44-6), Dewan Dep. 168:10-19; Ex. N (#44-7), Casey Dep. 163:16-
18.[34]

---

[34] In reply (#50 at p. 16), M-I argues that just because
program engineers exercise independent judgment and discretion in
creating the mud plan does not prevent Plaintiffs from also
exercising those traits. The depositions provide numerous examples
where Plaintiffs exercised independent judgment and discretion:
formulating recommendations on mud additives based on actual down
hole conditions, which can vary from the mud plan; in attempting to
optimize the mud, mud engineers determine tradeoffs against the
twelve properties exercised by drilling mud, for which there is no
formula; and usually their recommendations are implemented before
review. While substantial monetary damage is not the sole
determiner of the administrative exemption, it is a factor relevant
to assessing it under the plain language of 29 C.F.R. § 541.202(a).
Given the grave consequences of a failure to perform their duties
adequately (stuck pipe, loss of revenue, loss of the well, and
possible explosions), it is a "matter of significance."

To qualify Dewan and Casey for the outside sales exemption, M-I must show that they primarily made sales within the meaning of 29 C.F.R. § 203(k) or obtained orders or contract for services or for the use of facilities for which the client or customer paid consideration, and (2) they were regularly engaged away from M-I's place or places of business. 29 C.F.R. § 541.500(a). Plaintiffs argue that M-I has failed on both prongs. There is no evidence that Dewan's and Casey's primary duty was making sales or that they ever sold anything. To determine whether an employee's primary duty is making sales, pursuant to 29 C.F.R. § 541.504(b) the court considers "a comparison of the driver's duties with those of other employees engaged as truck drivers and as salespersons; possession of a selling or solicitor's license when such license is required by law or ordinances; presence or absence of customary or contractual arrangements concerning amounts of products to be delivered; description of the employee's occupation in collective bargaining agreements; the employer's specifications as to qualifications for hiring; sales training; attendance at sales conferences; method of payment; and proportion of earnings directly attributable to sales." *See also Olivo v. GMAC Mortgage Corp.*, 374 F. Supp. 2d 545, 550 (E.D. Mich. 2004)(relevant factors include evaluating whether an employee has a primary duty of outside sales training, is compensated by a commission, is labeled as a salesman, is held to a production standard, and has freedom from

supervision); *King,* 11 F. Supp. 3d at 785 ("outside salesman's extra compensation comes in the form of commissions").

Plaintiffs contend that they did not have a primary duty of making sales.  When they were hired, as reflected in their depositions, M-I did not tell them that the mud engineer position was sales-related, they never received any sales training while employed by M-I, and they did not solicit new customers or sell anything.  Ex. M, Dewan Dep. 163:21-164:1; Ex. N, Casey Dep. 156:25-157:3.  *See also Olivo*, 374 F. Supp. 2d at 550 (among factors courts consider for the outside salesman exemption is "whether the employee (1) must solicit new business; (2) receives sales training; (3) was hired and denominated as a salesman; (4) was paid on a commission basis; (5) was required to meet minimum standards; and (6) was subject to direct or constant supervision").[35] Nor is there evidence that they received any extra compensation in the form of commissions, nor any evidence that would allow them to conclude that selling was their primary duty. In addition, M-I has full-time sales people who are not mud engineers.

---

[35] This Court observes that the *Olivo* judge cited *Fields v. AOL Time Warner, Inc.*, 261 F. Supp. 2d 971, 974 (W.D. Tenn. 2003), in which the court listed as factors probative of an employee's status as an outside salesman "(1) must solicit new business, (2) receives sales training, and (3) was hired and denominated as a salesman," as well as "whether the position was advertised as a sales position."  As will be discussed, these factors are not satisfied by Dewan and Casey.

Plaintiffs claim that the administrative exemption and the outside sales exemption are mutually exclusive. *Swigart v. Fifth Third Bank*, 870 F. Supp. 2d 500, 511 (S.D. Ohio 2012)(outside sales exemption and administrative exemption are mutually exclusive because the outside sales exemption requires the employee to have a primary job duty of sales, whereas the same primary job duty disqualifies an employee from coverage under the administrative exemption). Furthermore the combination exemption only applies where the employee does not meet the primary-duty requirement of any individual exemption. *King*, 11 F. Supp. 3d at 786 ("According to the Secretary [of Labor], this [combination] exemption is intended to address 'the situation that exists when an employee does not meet the primary-duty requirement of any individual exemption.' It is 'a mechanism for cobbling together different exempt duties for purposes of meeting the primary-duty test.'"), *quoting IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 294 (4th Cir. 2007). Where an employee meets the primary duty requirement of an individual exemption, the combination exemption does not apply. *Id.* Plaintiffs insist that either the summary judgment evidence shows that Dewan's and Casey's primary duty was administrative or making outside sales or they had no primary duty, but not all three or even two of these exemptions.

Moreover, argue Plaintiffs, the combination exception does not apply because M-I has failed to establish as a matter of law that

Dewan or Casey performed any administrative duties or that they had any actual sales responsibilities. *Dalheim*, 918 F.2d at 1232 (no need to consider combination exemption where employees do no exempt work or only one type of exempt work); *King*, 11 F. Supp. 3d at 786 (same).

In sum, maintain Plaintiffs, M-I's motion for summary judgment on the administrative, outside sales, and combination exemptions should be denied.

### M-I's Reply Brief (#50)

M-I replies that the following facts are undisputed: Plaintiffs each received a starting salary of $53,100 per year and bonus compensation on top of that. (Dewan Dep. at 68:8-10; Casey Dep. at 77:6-8); both men were located at customer sites, not in M-I's offices, performing non-manual work (Dewan Dep. at 36:23-37:1, 89:7-90:2; Casey Dep. at 94:10-12, 165:3-5); their job was to provide advice and recommendations to M-I's clients regarding the mud system, a critical component of their business operation[36] (Dewan Dep. at 95:9-22; Casey Dep. at 62:25-63:3, 73:11-20); their job also was to sell products to those clients, including basic mud supplies and upselling specific M-I services (Def.'s Ex. 8; Dewan Dep. at 76:18-77:11; Casey Dep. at 111:7-16). M-I concludes that Plaintiffs were highly paid outside consultants who meet the

---

[36] The Court finds that Plaintiffs have raised questions about whether managing the mud system is directly related to management and general business operations.

requirements for administrative exemption.  Furthermore Plaintiffs admit that a significant and routine part of their job was selling to the client; thus the outside sales exemption applies.  M-I further argues that Plaintiffs have failed to accurately state the law or the facts in their response and do not directly refute any facts put forth by M-I or any of the case law cited by M-I.[37]

M-I argues that after mud engineers use standard tests, visually observe the mud and rig conditions, and talk to the drilling crew to determine actual down hole conditions, they then formulate and make recommendations to the rig supervisors about chemical additives and other treatments to the mud for the next 12-24 hours.  Dewan Dep. at 126:17-127:7, 95:9-22; Casey Dep. at 106:17-107:10, 62:25-63:3, 73:11-20.  Mud engineers use independent judgment and discretion in making those recommendations for determining trade-offs among various mud properties in order to optimize the overall performance of them mud.  Dewan Dep. at 151:25-152:5; Casey Dep. at 151:6-14.

There are five different levels of mud engineers.  #31-4, Van Vranken's (M—I's Operations Manager's and Plaintiffs' supervisor's) Dep. at 6:21-7:15.  The entry level that Plaintiffs discuss is DFS1, but Dewan and Casey were both hired as DFS2s.  Dewan Dep. at

---

[37] Since the Court has set out its standard of review for each motion, it does not address M-I's arguments about them.

67:15-68:1; Casey Dep. at 38:11-25.[38]

As for sales duties, M-I argues that both Plaintiffs testified that they ordered product from the warehouse for their customers that was billed and shipped directly to the customer. Dewan Dep. at 23:3-11; Casey Dep. at 110:6-22. They both testified that they were responsible for marketing and up selling M-I products. Dewan Dep. at 76:18-77:11, 79:12-80:4; Casey Dep. at 111:7-112:4. Their job descriptions expressly included sales-related duties. Dewan and Case Dep. at Ex. 8. They both stated that they were aware of the responsibility to make sales. Dewan Dep. at 23:3-11, 92:7-14, 93:11-15; Casey Dep. at 110:2-111:1, 111:17-112:4. Their supervisor, Donnie Van Vranken, testified that he expected them to perform sales-related duties. Van Vranken Dep. at 16:16-22.

Plaintiffs both testified that they had the authority to recommend changing the specifications if down hole conditions warranted the change. Dewan Dep. at 100:4-10, 168:10-18; Casey Dep. at 107:2-10. They further testified that their recommendations were usually accepted and implemented before the recommendations were even received and reviewed by any member of M-I's management. Dewan Dep. at 100:1-10; Casey Dep. at 108:5-9.

---

[38] The Court would point out that Van Vranken testified during his deposition, #44-3 at 6:1-25, that all engineers in his district were hired as Drilling Specialist II's, that there is no difference in job duties between I's and II's other than compensation and some experience and training, and that the job function is about the same.

Their primary duty of managing the mud system included overseeing the customer's drilling crew in maintaining the mud and making recommendations to the customer. Dewan Dep. at 76:21-24; Casey Dep. at 93:22-24, 161:20-162:1. They worked at the customer's location, and could leave the drilling site with permission from the site supervisor. Dewan Dep. at 36:23-37:1, 92:21-94:23; Casey Dep. at 65:24-68:13.

M-I highlights the fact that when Plaintiffs listed the functional areas directly related to management or general business operations in 29 C.F.R. § 451.201(b), they omitted "quality control." Plaintiffs insist that their duties are in the nature of quality control. Dewan Dep. at 106:16-107:8, 131:8-139:9; Casey Dep. at 106:22-107:10, 118:8-119:24.

As for Plaintiffs' claims that they received commissions, Dewan and Casey both denied that allegation. Van Vranken, however, testified that mud engineers are periodically eligible for incentive bonuses for selling specifically identified products. Van Vranken Dep., #44-3 at 16:23-17:4.

Plaintiff argue that they are production employees, or, alternatively, function more like cooks, janitors, security guards, or investigators. Calling such claims meritless, M—I insists that the record demonstrates that Dewan and Casey do not produce M-I products, but sell such products to the customer by placing orders from M-I's warehouse. Dewan Dep. at 23:3-11, 92:7-14, 93:11-15;

Casey Dep. at 110:2-111:1, 111:17-112:4.  At the client's drilling
site they perform non-manual work.  Dewan Dep. at 89:7-15; Casey
Dep. at 94:10-12.   Furthermore M-I's policy bars them from
performing work on the drilling rig.  Dewan Dep. at 89:21-90:2.  In
their claim that they function more like cooks, janitors, security
guards, or investigators, Plaintiffs rely on a Department of Labor
opinion letter regarding Department Of Defense ("DOD") background
investigators.  #46, Tab 17, WH Op. letter not FLSA 2005-21 (August
19, 2005).   M-I highlights the fact that the Department of Wage
and Hour specifically pointed out that the background investigators
merely presented findings to the DOD, which made its own decisions
about the issuance of security clearances.  In contrast, everyone
testified that Plaintiffs were responsible for both determining
current down hole conditions and making recommendations for
processes   going   forward   that   could   deviate   from   the
engineer-prepared mud plans and which were normally accepted by the
client as a matter of course.  Dewan Dep. at 95:9-96:1; Casey Dep.
at 44:21-45:1.   Interacting with the client representative in
charge of the drilling rig, who set goals or expectations about the
pace of drilling and target depth, using independent judgment and
discretion Dewan would make adjustments or trade-offs in drilling
mud consistency and properties to achieve those ends.  Dewan Dep.
at 57:14-17, 95:9-22, 100:4-10, 118:6-119:3, 126:17-127:1, 90:3-21,
23:12-14:4,  117:4-118:10,  118:6-119:3,  128:17-127:1,  127:2-7,

170:11-171:10.    As  noted,  he  recommended  M-I  additives  and
equipment  for  purchase  and  consummated  sales  through  orders
directly to M-I's warehouse.

M-I maintains that Dewan and Casey's work related directly to
assisting  or  servicing  of  the  business  because  the  business  does
not run if the mud system is not operating properly.  Dewan Dep. at
108:2-109:24; Casey Dep. at 118:8-120:23.  M-I reiterates that they
served  as  outside  consultants  (*see*  §  541.201(c)),  constantly
reviewing  the  status  of  the  customers'  mud  system  and  making
recommendations to optimize its performance.

M-I  objects  that  in  two  mutually  exclusive  arguments,
Plaintiffs contend that they cannot be administrative assistants
because  they  are  not  running  the  business  nor  determining  its
overall  course  or  policies  and  because  their  work  is  specific  to
the customer's industry rather that the kind of work every employer
needs regardless of the industry.   If they were running the
customer's business, they would be performing work particular to
the customer's industry.   29 C.F.R. § 202(b) lists factors that
should be weighed in determining whether Plaintiffs satisfy the
requirements for the administrative exemption, including "whether
the employee provides consultation or expert advice to management;
. . . [and] whether the employee investigates or resolves matters
of  significance  on  behalf  of  management."   As  the  undisputed
evidence  shows,  the  drilling  fluid  specialists  satisfy  the

-78-

following requirements under § 541.201(b):

> whether the employee has the authority to formulate, affect, [or] interpret . . . operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; . . . whether the employee has authority to waive or deviate from established policies and procedures without prior approval; . . . whether the employee provides consultation or expert advice to management; . . . whether the employee investigates and resolves matters of significance on behalf of management.

M-I maintains that its motion for summary judgment shows Plaintiffs perform work directly related to the customer's general business operations in compliance with DOL regulations and cited case law. Because that work requires discretion and independent judgment, their work is distinguishable from that in the cases and opinion letters cited by Plaintiffs.

As for the education level required, there are no specific educational or training requirements for the administrative exemption. The key inquiry is whether Plaintiffs were required to exercise independent judgment and discretion as to matters of significance, and M-I insists that it has shown they did. M-I notes that both Dewan and Casey came with considerable experience: Dewan worked for four years as an oil well driller on the Alaskan North slope, during which his duties included mixing mud under the supervision of a mud engineer. Dewan Dep, at 15:14-20. Casey had five years of work experience, including in the U.S. Army reserve

-79-

forces and deployed to Fallujah and Mosul, Iraq as a military officer, as well as a year in electronics on the North Slope wiring oilfield companies.   Casey Dep. at 14:9-17:8, 18:5-17, 16:2-6, 18:5-17.

M-I contends that the law is clear that an employer can raise an administrative exemption and a sales exemption simultaneously. As for the outside sales exemption, M-I points out that the Department of Labor's Field Operations Handbook and court decisions demonstrate that the combination exemption "allows for 'tacking' or combining exempt work under one category of exemptions to exempt work under another category when determining if an employee's primary duty is to perform exempt work.   Dept. of Labor Field Operations Handbook § 22h03 (Nov. 29, 2010).

To show that Plaintiffs qualify for the outside sales exemption, M-I only has to demonstrate that Plaintiffs were employed away from M-I's place of business and that they had a primary duty of making sales, as it claims it has done through deposition testimony.   29 C.F.R. § 541.500.   Dewan and Casey regularly worked at a client's drilling site and inventoried product and ordered new product for the client from M-I's warehouses.   Dewan Dep. at 36:23-37:1, 92:21-93:6; Casey Dep. at 1110:2-9. 165:3-5.   Plaintiffs concede that they were responsible for up selling M-I products to their customers and recommending M-I products over other companies'.   Dewan Dep. at 77:12-20; Casey Dep.

at 111:7-16.  They were also eligible for bonuses if they sold specific items.  Dewan Dep. at 23:3-11, 92:7-14. 93:11-15; Casey Dep. at 110:2-111:1, 111:17-112:4.

Finally M-I argues that if the Court finds the combination exemption or the administrative or outside sales exemptions do not constitute Plaintiffs' primary duty, the combination exemption applies.  Plaintiffs had a primary duty of administratively managing the mud system for the customer and making recommendations to M-I's customers regarding the mud system.  Plaintiffs also had a primary duty of ordering products and recommending M-I products to their customers.  Thus if they are not independently exempt under either the outside sales or administrative exemptions, the combination of their exempt duties under both would make their primary duty exempt work under the combination exemption.

### Court's Decision

Because the copies of Dewan's and Casey's depositions attached to Plaintiffs' Response are more complete than the excerpts attached to M-I's motion for summary judgment, merely for simplicity and clarity the Court cites to the former.

### Outside Sales Exemption

First, the Court finds that M-I has failed to show that Dewan and Casey qualify for the outside salesman exemption, by itself, from the FSLA's overtime. § 541.500(a).  Not only was making sales or obtaining orders for M-I customers not Dewan's or Casey's

primary duty, but the testimony of Dewan and Casey establishes that they did not make such sales. Because they are proceeding individually and not as a class, what other mud specialist employees of M-I did, or what Van Vranken testifies other mud specialists have done, is irrelevant.

Although the job description for an M-I Drilling Fluid Specialist II (Ex. 8 to Dewan's Dep., #31-4 on second page) states that responsibilities include "Sell and influence clients' decision in buying the optimal M-I SWACO products and systems to maintain the necessary mud properties," that "function" is listed eighteenth out of nineteen functions, none of which is identified under the heading, "Primary Job Function/Key Responsibilities," on page one. Moreover during his deposition, Dewan testified that he had the ability to suggest and recommend that the client buy M-I's products (#44-6, pp. 79:12-80:4), but he also stated that he "didn't actually" sell and influence the "client's decision in buying the optimal M-I SWACO products and systems" because "that was kind of all done ahead of time. They were already sold on M-I. That was why we were out there" (*id.* at p. 77:12-20). Later, on cross, he added, "No, I didn't sell any products. I gave my recommendations on how much of what to use." #44-6 at p. 163. He further testified that no part of his pay came from commissions, that when he interviewed for the job, it was not described to him as a sales position, and that he did not consider himself a salesperson. *Id.*

at p. 163:18-164:1.  Casey testified at his deposition that while he ordered product when his inventory was low and spent about 30 minutes doing so when product was needed, which was not every day (#44-7 at p. 66: 20-21, 67:4-8), he would order M-I products straight from M-I's warehouse, that he did not have the ability to use competitors' products (*id.* at p. 110 at 10-22), but that if the customer wanted someone else's products, he would try to influence him to switch (#44-7 at p. 11:13-19).  But it is reasonable to infer from his deposition testimony that such efforts to influence a customer to switch constituted at most a minimal part of his work.  Like Dewan, Casey testified that when he was interviewed for the mud man position at M-I, it was not described to him as a sales position, that he did not recall being given any training for sales, that no part of his compensation was tied to the amount of products he sold, and that he did not get a commission (*id.* at 156:19-157:12).[39]    Finally, Van Vranken's deposition testimony (#44-3, at p. 21:6-12) established that in the Oklahoma district at issue here M-I employs three full-time sales people who are not drilling fluid specialists and who have a sales manager in Houston.

M-I has not shown, pursuant to  29 C.F.R. § 541.504(b), on drive-bys that either satisfies the requirements for "Drivers  Who

---

[39] *Cf. Fields v. AOL Time Warner, Inc.*, 261 F. Supp. 2d at 974 (factors probative of an employee's status as an outside salesman include "(1) must solicit new business, (2) receives sales training, and (3) was hired and denominated as a salesman," as well as "whether the position was advertised as a sales position.").

Sell" under 29 C.F.R. § 541.504(b):  M-I has not provided evidence comparing "the driver's duties with those of other employees engaged as truck drivers and as salespersons; possession of a selling or solicitor's license when such license is required by law or ordinances; presence or absence of customary or contractual arrangements concerning amounts of products to be delivered; description of the employee's occupation in collective bargaining agreements; the employer's specifications as to qualifications for hiring; sales training; attendance at sales conferences; method of payment; and proportion of earnings directly attributable to sales."

**Administrative Exemption**

In determining whether the administration exemption applies, the Court finds the evidence reflects that in some respects there are differences between Dewan and Casey, but that both men qualify for the exemption.  Meeting its burden of proof for summary judgment, M-I has submitted evidence that supports their qualifications for the administrative exemption under 29 C.F.R. §§ 541.00(a) and 541.202 and demonstrates that the three prongs of 29 C.F.R. 541.200 are satisfied and that M-I did not improperly misclassify them as administratively exempt employees.

Regarding the first prong of 29 C.F.R. § 541.200, M-I has shown, and there is no dispute, that both men received weekly salaries of more than $455 dollars throughout the period or their

employment.

For the second prong, both Dewan's and Casey's primary duty, the management of the mud systems of M-I's customers, directly related to the general business operations of the employer or the employer's customers, which was their principal value to M-I and its business of supplying drilling fluid systems engineered to improve, even optimize, drilling performance to the oil industry while reducing costs.  More specifically, their duties directly related to the general business operations because nearly all of their working time related directly to continually monitoring the mud for quality control, in compliance with 29 C.F.R. § 541.201(b), and because Dewan and Casey acted as advisors or consultants to M-I's customers, in compliance with 29 C.F.R. § 541.201(c).

They also meet the third prong of 29 C.F.R. § 541.200, including the exercise of discretion and independent judgment with respect to matters of significance, i.e., here quality control of the condition of the mud, which M-I has shown is a vital part of drilling, because the primary duty of both Dewan and Casey involved first determining the condition of the mud in various locations admittedly through a variety of fairly standard tests, and but then having to decide which of various additives and treatments of the mud or what tradeoffs would optimize drilling performance, i.e., considering and evaluating alternative courses of action, thus requiring them clearly to exercise discretion and independent

judgment.   While they strove to stay within the parameters of the mud plans created by engineers in M-I's offices, they could deviate from or go outside of those parameters when conditions required them to, thus affecting operating procedures under 29 C.F.R. § 541.202(b).

As for supervision, M-I presented evidence demonstrating that Dewan and Casey each worked at the customer's drilling sites as the only mud engineer on location without any direct supervision. There are distinctions between Dewan and Casey's experiences.   As noted, Dewan, who was more experienced and had apparently established his authority with those at the drill sites, testified that his recommendations for changes to the mud were nearly all accepted and, indeed, were implemented before M-I even received his e-mailed reports, and that only rarely did M-I provide feedback on his reports.   Casey, on the other hand, suggesting that "a company man just won't accept a fresh, new mud engineer's recommendations," testified that some company men did not automatically accept his recommendations about additives to the mud and required him to explain them.   #44-7 at 45:5-9, 43:10-44:11.   Nevertheless Casey stated that "for the most part," the critical company men accepted his recommendations, but if they did not, "they would call my supervisor and my supervisor would explain them" and "then they would accept it." *Id.* at 44:21-45:1.   While his supervisors, John Webster and Gary Seabeck, did not ask him about these instances,

Casey testified that Gary Seabeck came out to Casey's work site "pretty often," probably once a month for a couple of hours, "to see what's going on" with the mud and "go talk to the company man, see if he's satisfied with everything." *Id.* at 45:6-46:20.  As for the engineer-prepared mud plans, when asked if he suggested changing the elements in a mud plan, he responded "I would have to--I wouldn't be the one to make that call.  I would have to call the office." *Id.* at 107:2-7.  Nevertheless he also stated that he would make the recommendation. *Id.*, 107:8-10.  As noted *infra*, 29 C.F.R. § 541.202(c) expressly states that the term "discretion and independent judgment" does not require that the decisions made by an employee have a finality that goes with unlimited authority and complete absence of review.  The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action.  The fact that an employee's decision may be subject to review and that upon occasion the decision are revised or reversed does not mean that the employee is not exercising discretion and independent judgment." *See also Tyler*, 304 F.3d at 403.

Because the evidence supports M-I's claim that Dewan and Casey were administratively exempt and that their primary duty was management of mud systems to improve drilling performance, the combination exemption does not apply.

Accordingly for the reasons stated above, the Court

ORDERS that motions to dismiss opt-in Plaintiff William J. Casey are DENIED and Casey may proceed as a full Plaintiff.  Thus Court

ORDERS that M-I's motion for summary judgment (#31) is DENIED as to dismissal of Casey.  The Court further

ORDERS that Dewan's motion for partial judgment on the pleadings as to certain affirmative defenses (#51) for the reasons state above is DENIED.  Finally the Court

ORDERS that M-I's motion for summary judgment (#31) on the grounds that Dewan and Casey are not entitled to overtime pay because they qualify as exempt employees under the administrative exemptions and that M-I did not misclassify them is GRANTED. Accordingly, this suit to recover  unpaid overtime wages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201-219, shall be dismissed.  Final judgment will issue by separate document.

**SIGNED** at Houston, Texas, this  22nd  day of  February , 2016.

_____

MELINDA HARMON
UNITED STATES DISTRICT JUDGE